358 So.2d 190 (1978)
Thomas HILL, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. EE-403.
District Court of Appeal of Florida, First District.
March 31, 1978.
As Corrected On Denial of Rehearing May 10, 1978.
*193 Michael J. Minerva, Public Defender, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Richard A. Hixson, Asst. Atty. Gen., Tallahassee, for appellee.
SMITH, Judge:
In 1965 Thomas Hill, Jr. was indicted for first degree murder in a particularly repulsive slaying of a Liberty County woman. His psychosis rendered him unfit for trial, so Circuit Judge Ben C. Willis  whose familiarity with the case and with Hill extends from 1965 to the present  committed Hill to the Florida State Hospital at Chattahoochee. In 1972 Hill had recovered sufficiently for trial and, on his waiver of a jury, Judge Willis found him not guilty by reason of insanity and recommitted him to Chattahoochee. Fla.R.Crim.P. 3.460. In December 1976, by the order here appealed, the court denied Hill's petition for release.
Hill's psychosis is now in remission and under medicinal control in the protected environment to which Hill is involuntarily confined. The evidence shows, and Judge Willis found, that Hill if released would probably engage in "nothing but peaceful conduct" if he continued to take his medicine and regularly saw a doctor at Chattahoochee or a community mental health center. A testifying psychiatrist believes that sufficient day-to-day supervision could be provided by Hill's family, who with family friends have offered to assure  insofar as they have power to assure  that Hill will take his medicine and keep his medical appointments. Members of the victim's family and other Liberty Countians testified that they have no objection to Hill's release under the circumstances. Nevertheless, Judge Willis denied Hill's petition for release, stating:
It is not enough that the defendant is not likely to engage in violence or destruction. It is insufficient that the probabilities of peaceful conduct outweigh, even substantially, the contrary.
In this case the defendant, while in a psychotic condition, perpetrated a most brutal homicide and his actions were of such depravity as to exhibit violent, destructive *194 and bestial qualities with no inhibitions whatsoever. That such psychosis existed was confirmed by medical experts and was the basis of his commitment to the hospital for treatment rather than to be convicted as a murderer. Now, this psychotic condition is merely in remission, held there by regular medication and constant supervision. A loss of remission, either by failure of the medication to continue effective, by failure to properly administer it, or by any other factor which would produce that result would expose the members of the public to unspeakable horrors, death and destruction. Though the probabilities are that his release will result in nothing but peaceful conduct, the possibilities that it will be tragic are more than merely speculative. The Court feels that these possibilities are of sufficient gravity to dictate that the defendant be retained in institutional care and control. (Emphasis added.)
This case thus renews the debate over standards for the release to society of the once criminally insane: those who for insanity alone were acquitted of violent crimes, who were judicially committed to hospitalization until the danger of their being at liberty shall have passed, and who eventually progress in confinement until psychotic symptoms are remitted. The probabilities are that, if released, Hill can and would live among his family and friends in Liberty County, work in his father's sawmill, take his medicine, regularly visit the community mental health center in Panama City, and so pass his life peaceably. The broad question is, Who shall bear the small but potentially grave risk that Hill's remission is dependent on the constancy of his present regime, or on medication which Hill at liberty may neglect? Characteristically, the law does not address such a question all at once, but separates it into manageable parts, which are:
First, is the determinative standard whether Hill if released would be manifestly dangerous to others, or is it rather whether he would be likely to injure another? Compare Fla.R.Crim.P. 3.460 with Section 394.467(1)(a), Florida Statutes (1977), and Fla.R.Crim.P. 3.210(e)(9). There was confusion in the law at the time of Judge Willis' order; and it is not clear which of these standards he employed to deny Hill release, if indeed he employed either.[1] Since then, State ex rel. Boyd v. Green, 355 So.2d 789 (Fla. 1978) has made the likely-to-injure test determinative. Under the law thus clarified, which would apply to Hill in any event if we were to affirm and he reapplied for release, it was incorrect for the circuit court to have held, "It is not enough that the [insanity acquitee] is not likely to engage in violence or destruction." We find that further proceedings, rather than an order for Hill's outright release, are appropriate.
Second, on whom, Hill or the state, is the burden of proof; and what is the necessary quality of proof? The risk of nonpersuasion falls on the acquitee; and grounds for his release must be shown by a preponderance of the evidence. A criminal acquitee is not denied equal protection by allocating the burden of proof differently than in civil commitment cases where, arguably, grounds for continued commitment must be shown by clear and convincing evidence. See In re Beverly, 342 So.2d 481, 488 (Fla. 1977).
Third, wherein was the proof lacking that Hill is not likely to injure others and is entitled to release? We find that the quality of proof on the issue was inadequate, but that, given its apparent effect, the proof lacked only an impossible guaranty that Hill's illness would remain in remission.
*195 And fourth, what medical or legal remedy can relieve Hill of the impossibility of his guaranteeing, from a condition of confinement, that he would not lose remission in a condition of liberty, and therefore that he is unlikely to injure others? We offer one procedural standard and one substantive remedy  conditional release  to assist committing judges in accomplishing their difficult task in these cases.

Standard for release
Rule 3.460 authorizes commitment of one acquitted for insanity if his release would be "manifestly dangerous to the peace and safety of the people."[2] But the Baker Act, Section 394.467(1)(a), authorizes commitment of one who, by reason of mental illness, is "[l]ikely to injure himself or others if allowed to remain at liberty."[3] The difference is more than semantic. In two respects the likely-to-injure standard is more particular, tending to produce fewer commitments and more releases, than the manifestly dangerous standard:
First, likely-to-injure contemplates physical or emotional injury,[4] whereas manifestly dangerous may include also threatened injury to property or other societal interests.[5] Considering types of dangerousness alone, and disregarding probabilities of it, as many as ten substandards can comfortably be housed under the expansive roof of dangerousness.[6]
Second, likely-to-injure requires a more exact prediction of harm; it connotes a probability of injury. Manifestly dangerous does not. One who is likely to injure another is surely dangerous; but one who is *196 not likely to injure another may yet be dangerous, if the possibility of injury is more than speculative and the injury that is possible is also grave. Likely-to-injure emphasizes the dimension of probability. Manifestly dangerous, on the other hand, is a mixed question of "[t]he likelihood of future misconduct, the type of misconduct to be expected, and its probable frequency... ." Dixon v. Jacobs, 138 U.S.App. D.C. 319, 325 n. 17, 427 F.2d 589, 595 n. 17 (1970); State v. Krol, 68 N.J. 236, 260, 344 A.2d 289, 302 (1975) (dangerousness is "a product of the likelihood of such conduct and the degree of harm which may ensue"); Proctor v. Butler, 380 A.2d 673, 677 (N.H. 1977).
The District of Columbia Code contains the same dichotomy  dangerousness versus likely-to-injure  that is created by criminal Rule 3.460 and Section 394.467(1)(a).[7] There the difference has not been particularly troublesome, because likely-to-injure is applicable specifically to civil commitees and dangerousness to criminal acquitees; because there is no overlay of jurisdictional conflict between a rule and statute; and because no case seems to have been controlled by the difference. But the United States Court of Appeals for the District of Columbia has recognized the difference. After some initial conflict, compare Hough v. United States, 106 U.S.App.D.C. 192, 271 F.2d 458 (1959), with Bolton v. Harris, 130 U.S.App.D.C. 1, 12, 395 F.2d 642, 653 (1968), the court held in United States v. Ecker, 177 U.S.App.D.C. 31, 40, 543 F.2d 178, 187 (1976), that "it is not technically sufficient," when applying the dangerousness standard to an acquitee's release petition, "merely to find that the patient `is no longer likely to injure himself or other persons because of mental illness.'" Approving Judge Leventhal's concurring view in Dixon, 138 U.S. App.D.C. at 328, 427 F.2d at 598, the court held that dangerousness may result in continued commitment even though it cannot be said that injury is likely.
In spite of its relative vagueness, or perhaps because of its flexibility, the dangerousness test, including minor variations such as a likelihood of danger (not injury),[8] is commonly used by the other states for the commitment and release of insanity acquitees.[9]
In Florida proceedings for the commitment or release of insanity acquitees, the Baker Act's likely-to-injure standard now prevails over the manifestly dangerous standard of Rule 3.460. That may not be the final choice; but it is the current choice, and it seems to have been made by the Supreme Court when concentrating on other aspects of a fundamental dispute over legislative versus judicial prerogatives.
The Baker Act, as amended through 1975, did not simply provide a substantive standard for commitment and release different from the Rule 3.460 standard for insanity acquitees. The Act also provided independent administrative and civil court procedures for initial commitment and for commitment beyond six months. Section 394.467(2), (3)(a), (4), Florida Statutes (1975). It purported to require that criminal commitment orders under Rule 3.460 "adequately document the nature and [the] extent of [the] patient's mental illness," and *197 the Act licensed hospital administrators to turn away insanity acquitees who are unaccompanied by "adequate orders and documentation." Section 394.467(3)(b), (c), Florida Statutes (1975). One hospital administrator, supposing that the court had no authority to commit an acquitee absent civil proceedings, rashly rejected an insanity acquitee sent for hospitalization by court order. The administrator escaped jailing for contempt, but he was firmly advised by the Supreme Court, in an opinion that broached little discussion of the issue beyond a citation to the 1974 decision in Powell v. Genung,[10] that the trial court's commitment power over insanity acquitees was a procedural measure unaffected by inconsistent legislation which did not specifically repeal Rule 3.460 by two-thirds vote of both houses, pursuant to Article V, Section 2(a), Florida Constitution. In re Connors, 332 So.2d 336 (Fla. 1976), cert. denied, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976).
Connors also reached beyond commitment questions to reassert paramount judicial authority over periodic evaluation and release of Rule 3.460 acquitees. Legislation in 1975 had added Section 394.467(5),[11] requiring an acquitee's release after six months unless statutory grounds for continued commitment were found by a hearing examiner, or by a court overruling the hearing examiner. The Supreme Court, having held in Powell and in pre-Baker Act decisions that Rule 3.460 grants the committing court "continuing jurisdiction ... to determine by subsequent hearing and order whether defendant [is] still manifestly dangerous to the public," 306 So.2d at 116,[12] stated in Connors that petitions for reexamination and release would be determined first and finally, not by a Baker Act hearing examiner, but by the committing court, and not according to a statutory timetable, but rather "at reasonably separated period intervals or on the suggestion of the custodial official." 332 So.2d at 340. Thus implying if not explicitly demonstrating that Rule 3.460 is wholly procedural, Connors signaled that Rule 3.460 supersedes any inconsistent Baker Act provisions. The Court rejected the administrator's claim that "the statute supersedes the rule because of the substantive nature of the matter dealt with," stating that Powell had held to the contrary. 332 So.2d at 339. The Powell Court had indeed rejected, without discussion, Justice Ervin's dissenting view that the Baker Act as it then existed, before the 1975 legislation, controlled over Rule 3.460.
Soon after deciding Connors, the Supreme Court more fully occupied its jurisdictional field by promulgating another rule governing the commitment, retention, and release of persons acquitted for insanity. Rule 3.210, Fla.R.Crim.P.; Re Florida Rules of Criminal Procedure, 343 So.2d 1247, 1259-69 (Fla. 1977). Although the 1975 Baker Act amendments had recognized the continuing jurisdiction of the committing court in release matters,[13] and had subjected administrative release orders to review by the committing court,[14] even limited administrative *198 participation was regarded by the Court's rules committee as threatening a "head-on conflict" between the executive and the judiciary, and as creating the potential for "unwarranted" release of acquitees subject to the court's continuing jurisdiction. Re Florida Rules of Criminal Procedure, 343 So.2d at 1260 (Committee Note to Rule 3.210). Therefore new Rule 3.210(f) reduced the orders of Baker Act hearing examiners to the status of recommendations to the court, and subsection (e)(9) stated in certain terms:
The Court committing the defendant shall at all times retain jurisdiction of the cause and shall make all determinations relative to continued hospitalization (other than the form of treatment) or release of the defendant. [Fla.R.Crim.P. 3.210(e)(9)]
While new Rule 3.210 fulfilled and formally expressed the Court's jurisdictional claim in Connors, the Rule also adopted Baker Act commitment standards both for those not competent to stand trial, Rule 3.210(b)(1), and for those acquitted on account of insanity:
When a person tried for an offense shall be acquitted for the cause of insanity, if the Court shall then determine that the defendant presently meets the criteria set forth in Section 394.467(1), Florida Statutes (1975) the Court shall commit the defendant to the Department of Health and Rehabilitative Services for involuntary hospitalization, or shall order that he receive outpatient treatment at any other appropriate facility or service on an outpatient basis, or shall discharge the defendant. [Fla.R.Crim.P. 3.210(e)(9)]
The new Rule did not attempt to reconcile its adoption of the Baker Act's likely-to-injure standard with existing Rule 3.460's manifestly dangerous standard.
The lively jurisdictional dispute then escalated. Ignoring the Court's conciliatory gesture in adopting substantive Baker Act standards while insisting on judicially controlled procedures, the 1977 Legislature, with one dissenting vote, exercised its Article V, Section 2(a), power to repeal new Rule 3.210 almost before it became effective.[15] Chapter 77-312, Laws of Florida, extensively amended Chapter 394 and 921 to provide for trial court commitment of persons acquitted for insanity under the criteria of Section 394.467(1); for initial determination of release questions, under the same criteria, by Baker Act hearing examiners; for judicial review by the committing court of only those release orders which are contested administratively by the state attorney; and for de novo judge or jury trials, applying the same statutory criteria, in cases judicially reviewed. Sections 394.467(5), 921.131(2), Florida Statutes (1977).
Then the Supreme Court decided State ex rel. Boyd v. Green, 355 So.2d 789 (Fla. 1978). The Court held that Section 1 of Chapter 77-312 unconstitutionally removed the insanity issue from trials on the issue of criminal guilt, and struck down Section 10, which repealed Rule 3.210, as inseparable from the provisions held unconstitutional.[16]
If we correctly understand these events, they may be summarized as follows: (1) the Supreme Court held in Connors that judicial standards and procedures for commitment and release of acquitees, as stated by Rule 3.460, are impervious to legislative tampering except by outright repeal of Rule 3.460 under Article V, Section 2(a) of the Constitution; *199 (2) the Court by Rule 3.210 switched to the Baker Act likely-to-injure standard, while preserving close judicial control of procedures; (3) the 1977 Legislature repealed Rule 3.210 but not Rule 3.460, thereby apparently restoring the manifestly dangerous standard notwithstanding variant provisions in its Baker Act; and (4) the Supreme Court invalidated the legislative repeal of Rule 3.210, thereby insisting, as it were, that the Baker Act standard eclipsed that of its own Rule 3.460.
Thus we conclude that the determinative test is whether Hill, if released, would be likely to injure himself or others. Fla.R.Crim.P. 3.210, Section 394.467(1)(a), Florida Statutes (1975). For reasons that will appear, we cannot on this record order Hill released outright on Judge Willis' finding of "probabilities ... that his release will result in nothing but peaceful conduct." But we necessarily conclude that the court was incorrect in holding:
It is not enough that the defendant is not likely to engage in violence or destruction. It is insufficient that the probabilities of peaceful conduct outweigh, even substantially, the contrary.

II.

Burden of proof; standard of proof
Hill urges that the equal protection clause of the United States Constitution requires that insanity acquitees be given the same procedural advantages as are afforded civil commitees in Baker Act proceedings, specifically that the state has the burden to justify his continued commitment by clear and convincing evidence.
The Supreme Court held, in In re Beverly, 342 So.2d 481 (Fla. 1977), that clear and convincing evidence satisfying Section 394.467(1) standards is necessary for involuntary hospitalization under the Baker Act. The Court had no occasion to decide, and did not decide, whether commitments when periodically reviewed must continually be justified by clear and convincing evidence. Regardless of how that question may be answered for civil commitees, the answer need not be the same for one who is committed on appropriate findings after an insanity acquittal. Beverly itself recognized that "[t]here is a differentiation between persons in need of mental treatment and persons who [but for incompetency] violated the criminal laws." 342 So.2d at 488.
Although the mentally ill may be civilly committed on proof of mental illness and dangerous propensity, insanity acquitees are not committed without adjudication of both those elements and a recent criminal episode. The acquitee, but for his mental incompetence, is responsible for a criminal act. State ex rel. Boyd v. Green, 355 So.2d 789 (Fla. 1978).
A Florida verdict of not guilty by reason of insanity determines that there is reasonable doubt of the accused's competency at the time of the offense, but that there is no other reasonable doubt requiring his outright acquittal. See Byrd v. State, 297 So.2d 22 (Fla. 1974); French v. State, 266 So.2d 51 (Fla. 3d DCA 1972); Fla. Std. Jury Instr. (Crim.) 2.11(b) (2d ed. 1975). Because in Florida the criminally accused need not prove his incompetence by a preponderance of the evidence,[17] a Florida verdict of not *200 guilty by reason of insanity is not precisely the "functional equivalent of an adjudication of guilty but insane."[18] There can be no question, however, but that such a verdict determines to a moral certainty all aspects of the accused's guilt except his mental competence. When the court then determines that the acquitee is presently mentally ill and is likely to injure himself or others, that determination merges with the prior verdict to radically distinguish the acquitee and to form an adequate constitutional basis for his special treatment thereafter.
The equal protection clause, as interpreted by the United States Supreme Court, does not require that the state treat insanity acquitees and civil commitees alike in allocating the burden of proof and fixing the standard of proof required on release petitions. Baxtrom v. Herold[19] required protection for a prisoner, equal to that accorded civil committees, when involuntary hospitalization was sought near the end of his prison term. Humphrey v. Cady[20] required protection for convicted criminals equal to that accorded civil commitees when involuntary hospitalization is sought beyond the maximum sentence term authorized for their crimes. And Jackson v. Indiana[21] held that one accused of crime, whose incompetency prevents a trial, cannot be held indefinitely without compliance with civil standards and procedures. Those decisions do not lessen the distinction between an ordinary citizen, committed in civil proceedings for mental illness, and one who was duly committed after being relieved of criminal responsibility on account of mental illness. Society has a special interest in criminal acquitees. See Chase v. Kearns, 278 A.2d 132, 138 (Me. 1971):
The special interest which the public has acquired in the confinement and release of people in this exceptional class results from the fact that there has been a judicial determination that they have already endangered the public safety and their own as a result of their mental conditions as distinguished from people civilly committed because of only potential danger.
See also People v. Lally, supra n. 17; In re Franklin, supra n. 17; State v. Taylor, 158 Mont. 323, 491 P.2d 877 (1972), cert. denied, 406 U.S. 978, 92 S.Ct. 2428, 32 L.Ed.2d 677 (1972); State v. Warren, 169 Conn. 207, 363 A.2d 91 (1975); State v. Carter, 64 N.J. 382, 316 A.2d 449 (1974); and the prolific writings of the United States Court of Appeals for the District of Columbia.[22]
Neither Rule 3.210 nor the Baker Act allocates the burden of proving factual issues on an acquitee's petition for release. But the burden of proof, in the sense of a risk of nonpersuasion, is on the acquitee. It is he who asserts that conditions have changed; it should be presumed, in the absence of countervailing evidence, that the condition which justified the original hospitalization order has continued, e.g., Hixon *201 v. State, 165 So.2d 436 (Fla. 2d DCA 1964); Horace v. Culver, 111 So.2d 670 (Fla. 1959); and there is general agreement that one who asserted his mental irresponsibility for a crime, winning hospitalization instead of jail or worse, should bear the burden of proving grounds for his release, e.g., Lynch v. Overholser, 369 U.S. 705, 715, 82 S.Ct. 1063, 1069-70, 8 L.Ed.2d 211, 218 (1962) (under the District of Columbia code).
A preponderance of the evidence is the standard of proof normally applicable in civil matters, Visingardi v. Tirone, 193 So.2d 601, 604 (Fla. 1967); Schoenrock v. Schoenrock, 202 So.2d 571, 573 (Fla. 2d DCA 1967), and is the degree of proof properly required for the release of insanity acquitees. People v. Lally, 19 N.Y.2d 27, 277 N.Y.S.2d 654, 224 N.E.2d 87 (1966); In re Franklin, 7 Cal.3d 126, 101 Cal. Rptr. 553, 496 P.2d 465 (1972); Hefley v. Texas, 480 S.W.2d 810 (Tex. Ct. App. 1972): Dixon v. Jacobs, 138 U.S.App.D.C. 319, 427 F.2d 589 (1970); State v. Krol, 68 N.J. 236, 344 A.2d 289, 303 n. 13 (1975). See also ALI Model Penal Code § 4.08(3); C. Hamann, supra n. 9 at 89. The duty to go forward with the evidence is another matter, to be addressed below; but the risk of nonpersuasion falls on the acquitee, and continued commitment is the result of a failure of proof that, if released, he would not be likely to injure others.

III

The record evidence supporting Hill's petition lacks only a guaranty of continued remission
Hill, represented by the Public Defender for the Second Circuit,[23] presented seven witnesses at the November 1976 hearing: Dr. Rodriguez, who is a psychiatrist and Hill's attending physician at the hospital; the patient's father, aged 63, a Liberty County sawmill owner and operator; a cousin who had visited Hill at Chattahoochee over the years; the victim's husband and her son; and two of the 42 Liberty Countians, most of whom appeared at the hearing, who signed a statement supporting Hill's petition. An Assistant State Attorney cross-examined some of the witnesses but presented no additional evidence. The record also contains the hospital superintendent's report to the court in October 1971, when Hill was returned for trial, including a staff evaluation of Hill on his first admission in May 1965.
All of the contemporaneous evidence presented indicates that Hill's mental illness is in remission and that, as Judge Willis found, his return to Liberty County would probably "result in nothing but peaceful conduct." Dr. Rodriguez had personally observed Hill for six months and he referred to Hill's medical record for an unstated period. The psychiatrist testified that Hill "is not actively hallucinating or having delusions and is in good contact with reality" and has "good insight" into his mental condition. He stated that Hill's illness is in "good remission," that he has been on "very, very good behavior" and, according to the records, that he has "never had any acting-out behavior" at the hospital. Hill enjoys full "ground privileges." At bedtime he takes 50 milligrams of Mellaril, a drug that inhibits psychomotor functions and so reduces the abnormal tendencies of psychosis.
Dr. Rodriguez testified that Hill is still in need of medication and psychiatric supervision, and that Hill, if released, would himself be capable of obtaining necessary treatment "as long as he stays in remission." The psychiatrist testified that the hospital would "make up a release plan" if the court ordered Hill's release, and that the plan would provide for weekly or semi-weekly visits to a community mental health clinic. He emphasized that someone such as Hill's parents would have to assume responsibility for assuring that Hill takes his medication and keeps his medical appointments. He further testified:

*202 If the mother and father are responsible, they could watch him closely and, if he shows any abnormal symptoms, they could take him to the hospital again or to the mental health clinic.
The psychiatrist declined to "guarantee" Hill's good behavior while at liberty:
Q. Doctor, do you feel that Thomas would have any problem taking his medication in the future?
A. In the hospital, no, but I could not guarantee it outside of the hospital.
.....
Q. And he needs psychiatric treatment?
A. At least an evaluation, because any patient who is schizophrenic could be acting out at any time.
The lay testimony indicated that Hill if released would live with his mother and father in Sumatra, and work in his father's mill; that his parents would support him financially and see that he takes his medicine and goes to the doctor; and that the victim's family and other residents in the community have no objection to Hill's coming home under his father's supervision.
Except for such nuances of apprehension as may be sensed in Dr. Rodriguez' refusal to "guarantee" Hill's future attention to his medical needs, all of the contemporaneous evidence tends to prove that Hill, if released, would not be likely to injure himself or others. The only countervailing evidence before Judge Willis was the undeniably shocking record of a psychotic killing 14 years ago, some details of which were revealed in the staff conference notes of May 1965:
He killed a woman, shooting her from the back with a.30-.30 rifle, which belonged to his father. He alleged that the gun discharged accidentally, but he now admits that he killed her purposely because she used to treat him badly and wanted him to do things continuously. Immediately after he killed the woman he proceeded to have intercourse with the body... . The patient states the woman wrote him a threatening letter prior to this incident, stating that if he ever went again with ____ ____, she would drown him in the river... .
... He was found actively psychotic and disoriented as to place and time. The patient was inappropriate, inadequate, and was smiling and laughing for no apparent reason, had visual and auditory hallucinations. These hallucinations go back at least three or four years and he heard women's voices as well as men's. The patient showed some disturbance of thought, associations were loose, he was very suggestible, and he had no insight whatever into his condition. His judgment was poor.
Reflecting on this record, one appreciates how poorly any general formulation of a release standard serves to answer the ultimate question before circuit judges in these cases: What kind of evidence, and how much of it, is required to show a probability of peaceful conduct which is sufficient to overcome the incalculable possibility, as Judge Willis put it, of "unspeakable horrors, death and destruction"? Whether the substantive test is likely-to-injure or manifest danger, and whether the proof standard is a preponderance of the evidence or something else, the final question almost defies analysis in conventional terms. That is because the scales balance different substances in their opposite trays: Hill's former and potential dangerousness cannot be quantified for comparison with the substantial evidence that his illness is in remission and is likely to remain so. Judge Bazelon's figure is apt: the acquitee's violent episode
is likely to weigh against nominally competing considerations the way a wolf weighs against a sheep in the same scales: even if the sheep is heavier when weighed separately, somehow the wolf always prevails when the two are weighed together. Keeping dangerousness on a taut leash is especially difficult where there is danger of murder, since the danger is admittedly grave and since its improbability, which theoretically discounts its gravity, is exceedingly difficult to quantify.

*203 Moreover, once a man has shown himself to be dangerous, it is all but impossible for him to prove the negative that he is no longer a menace.[24]
Judge Willis' order characterizes the likelihood of psychotic conduct by Hill as "more than merely speculative" but nevertheless as a possibility, not a probability. That possibility is related to a loss of remission "either by failure of the medication to continue effective, by failure to properly administer it, or by any other factor which would produce that result."[25] Judge Willis correctly reasoned that the possibility gains "gravity," weight but no more likelihood, from Hill's psychotic killing in 1964, and from that alone.
It is apparent, therefore, that Hill is now denied liberty because he has not satisfactorily proved matters which in confinement he cannot prove. There is no evidence that small daily doses of Mellaril, which for at least six years have been effective to remit Hill's aberrant tendencies, would in another environment become impotent. Any implication to that effect in the order is speculative. Hill apparently has demonstrated as much moral responsibility and autonomy as he can demonstrate in a confinement which by design requires little responsibility and autonomy. He apparently takes his daily medication as willingly as he can will to take it under a regimen that would enforce medication if he refused or neglected it. He apparently is as receptive to psychiatric observation and counseling as he can be in a confinement where, like it or not, he would be subjected to it. Hill's family and their friends have given assurances, with apparent earnestness, that they will "see to" Hill's continued daily medication and psychiatric supervision, semi-weekly if necessary. In short, Hill's proof of entitlement to release apparently fails, if it fails, because no one  not he, nor his family, nor his physicians  can guarantee continued remission.
We are bound to recognize ungrudgingly that Hill long ago was absolved of criminal responsibility. Though he killed, he was "unable to form the requisite intent" to commit murder.[26] For punishment's sake, or to deter others, Hill could not then and cannot now be imprisoned for a moment, even if the prison were a hospital idyllic except for walls and fences. Hill is not lawfully hospitalized to pacify someone's distress over his acquittal for insanity. He is not lawfully detained on the theory, however beneficent, that he is in need of treatment.[27] The government's sole legitimate interest in Hill is protecting others from a likelihood of injury that would result from his being at liberty. Irrespective, then, of the enormity of Hill's 1964 act, a judicial decision relieving Hill of absolute confinement must be made at the moment when a preponderance of all the reasonably available evidence shows that in his release there is no longer a likelihood of injury to others as a result of mental illness. Under this standard, a court of law cannot extend Hill's confinement until some psychiatrist of a bolder school than Dr. Rodriguez will utter a fatuous guaranty; or until the memory of Hill's violence has satisfactorily faded; or until time removes all risks by removing Hill or by performing on him, as inevitably it will, a lobotomy by isolation.
*204 If what we have described as apparent from this record is true in fact  we describe only what is apparent, for the paucity of evidence is a major flaw requiring a new hearing  then Hill has been shown as not likely-to-injure, nor even as manifestly dangerous. Given such a standard, we do not conceive that the state can lawfully maintain Hill in absolute and indefinite confinement, after substantial hospitalization has subdued and remitted his illness, for lack of a guaranty that if given liberty he would take his medicine and submit to psychiatric observation.

IV

Proceedings on remand
It would not do for us to remand this case without guidance for its further consideration and resolution. Though we are confident that what we shall say will not entirely remove the difficulty of the court's task in resolving the competing values of Hill's liberty and the public's entitlement to protection, it is appropriate that we dissipate some of the responsibility now devolving on the committing judge alone. We do that by assuming some of the responsibility ourselves, and by prescribing two procedural standards, hitherto unstated in Florida law but not, as far as we know, inconsistent with the Supreme Court's rules and decisions affecting the retention and release of insanity acquitees. One is a general evidentiary standard which relieves the acquitee of coming forward with all the pertinent evidence and imposes duties on the state which are to be enforced by the committing judge. The other authorizes conditional release of eligible insanity acquitees, and so ameliorates the conflict between the committing court's desire for a guaranty and the acquitee's inability to give it.

A. Our authority
We must consider whether a district court of appeal has power to authorize and require remedies which implicate the circuit court, the public prosecutor and defender, and agencies of the executive branch. We do not casually assume that power. This court has neither the discretion of a circuit judge nor the rulemaking authority of the Supreme Court. Yet there is a hiatus between the procedures required to resolve these cases properly and those that have thus far been provided by rules and decisions of the Supreme Court. In that hiatus the acquitee's fundamental rights are neglected; their vindication is postponed.
Powell, Connors, and Boyd make clear that insanity acquitees committed from the criminal justice system are special wards of the judiciary, for whom the circuit courts and the Supreme Court have primary and ultimate responsibility, respectively. While the rationale of the Supreme Court's exclusive jurisdictional claim is not yet entirely clear  there is some difficulty in regarding commitment and release standards as wholly procedural, not in part substantive  the jurisdictional claim has been made and, for our purposes, it is established. We assume that jurisdiction has not been established merely to keep insanity acquitees locked away until the committing judge is moved, like some potentate, to release them; that the judicial system's monitoring responsibilities are to be carried out in a way that visibly serves the rule of law; and therefore that this court's review powers are implicated.
Our lack of rulemaking power is no impediment. The Supreme Court has prescribed procedures essential to the rule of law not only by its constitutional rulemaking power, in which function we do not participate, but also by decision, in which we do. E.g., State v. Harris, 356 So.2d 315 (Fla. 1978). The courts of other states have by decision established needed procedures for the detention and release of criminal acquitees, including conditional release procedures affecting the executive branch. E.g., State v. Carter, 64 N.J. 382, 391-98, 316 A.2d 449, 454-58 (1974):
[T]he Legislature, in omitting a specific authorization for court sanctioned conditional release, was merely recognizing the court's inherent power to fashion appropriate remedies.

*205 The fact that the Legislature has acted to provide a remedy does not mean that the judicial branch is limited to the boundary lines of strict legislative expression in fashioning or denying remedies in a particular case... .
The court's power to fashion remedies in the realm of criminal justice is unquestioned. At common law, courts of criminal jurisdiction had the power to suspend sentences... . Probation has a deep-rooted common law basis... . It follows that a statute neglecting to mention probation would certainly not preempt the court's ability to provide for it... .
.....
Conditional releases accompanied by judicial and psychiatric supervision can be utilized under appropriate circumstances to keep a tight rein on possibly inaccurate and divergent psychiatric prediction. The alternative is to condemn all those who are not utterly free of an underlying mental illness to lifelong commitment in a mental hospital, regardless of the degree to which they can function and exercise control over themselves in society and regardless of the therapeutic effect of exposure to the outside world. In effect, denying the possibility of conditional release is "tantamount to an elaborate mask for preventive detention" of the mentally ill. [footnotes and citations omitted]
We therefore consider that this court shares in the judiciary's power by decision to fashion standards and remedies in release proceedings.

B. The evidence required
Valuable testimony was received from Hill's family and friends who described, and who themselves evidenced, the Liberty County environment into which Hill would move if released: his homelife, associations, work, financial support, arrangements for medication and psychiatric observation, and so on. The presence of those witnesses enabled Judge Willis to form at least an impression, not explicitly described in the order before us, of the character and reliability of the persons on whom Hill and society would depend for support if he were released. Such witnesses are essential to any meaningful consideration of an acquitee's release petition. They should be searchingly examined and cross-examined. Their education, experience, skills, and interest in the patient are obviously important considerations. The availability of family or friends for training in the recognition of psychotic symptoms,[28] and the availability of such training to them at Florida State Hospital or a community mental health clinic, are legitimate areas for inquiry. Since it was proposed that Hill return to the community in which the psychosis erupted, enough should be learned of the particular situation in which it occurred to predict the likelihood of its recurrence. See State v. Krol, 68 N.J. 236, 260, 344 A.2d 289, 302 (1975).
Regrettably, this record's only indication of the hospital's capacity to formulate a comprehensive release plan is Dr. Rodriguez' testimony that, if the court ordered Hill released, the Hospital's "social services" arm "would make up a release plan." The public defender inquired whether the court wished to review and evaluate that plan before deciding the release issues, and Judge Willis expressed interest in reviewing such a plan "if they are prepared to do that," but the record does not indicate what, if anything, ensued. A release petition should not be considered without a systematic proposal by the Department of Health and Rehabilitative Services for follow-up psychiatric care. The plan should realistically evaluate HRS and family or community resources for follow-up care, and it should propose means for verifying to the court that such care is being provided.[29] Release plans should be submitted to *206 the court sufficiently in advance of the scheduled hearing to enable the court and counsel to secure the attendance of any witnesses whose personal testimony is necessary for evaluation of the plan. Without such professional assistance, conscientiously provided, it is all but inevitable that the committing court will be forced to rely on momentary impressions of randomly selected witnesses in determining whether an acquitee, if released, would likely receive essential medical and other support.[30]
The Baker Act provides for administrative hearings on petitions affecting commitments of acquitees, supra n. 14, and Fla.R.Crim.P. 3.210(f) gives the resulting orders effect as recommendations to the court. Hill's petition for release recites that an administrative hearing was had on his petition, resulting in a hearing examiner's order recommending his release. That order is not in this record, and we have no way of knowing whether such an order exists, nor whether, if it exists, it was considered by Judge Willis. If administrative proceedings are had in respect to an acquitee's petition for release, the resulting order should be considered by the court and included in the record.
The evidence in this record of Hill's past and present psychiatric condition and propensities, by far the most important subjects of the court's inquiry, can best be characterized as sparse. No one testified that Hill is still psychotic, incurably or otherwise. That he is still "schizophrenic" is indicated only in an oblique reference by Dr. Rodriguez.[31] The single psychiatrist who testified had personally observed Hill for only six months. That is an inadequate offering on such serious issues, regardless of Dr. Rodriguez' familiarity with the medical record  which itself was not, but should be, offered and explained.
Expert psychiatric testimony is essential in these proceedings. But the committing court's determination of release issues cannot be dictated by such testimony. When determining the accused's competency at the time of an offense, the trial judge or jury is not bound to accept unrebutted psychiatric opinions when there is other evidence of the accused's competence.[32] For stronger reasons, judges weighing the complex *207 questions of dangerous propensities may properly find that unrebutted psychiatric opinion testimony is overcome by other substantial evidence. We do not denigrate psychiatric expertise. But that discipline does not claim infallible prophetic powers. Even within the field, opinions on the nature and extent of mental illness vary with "the examining psychiatrist's personal conception of normal social behavior."[33] Moreover, psychiatrists' predictions of future dangerousness are increasingly subject to doubt, not necessarily because of a few dramatic cases of recidivism by insanity acquitees who have been released, but because there is empirical evidence that psychiatrists generally are inclined to perceive dangerousness where there is none.[34] Finally, whether an acquitee is still mentally ill and for that reason likely to injure others is a legal question, not a medical question. In re Beverly, In re Connors, supra; see also State v. Krol, 68 N.J. 236, 261, 344 A.2d 289, 302 (1975):
It should be emphasized that while courts in determining dangerousness should take full advantage of expert testimony ..., the decision is not one that can be left wholly to the technical expertise of the psychiatrists and psychologists. The determination of dangerousness involves a delicate balancing of society's interest in protection from harmful conduct against the individual's interest in personal liberty and autonomy. This decision, while requiring the court to make use of the assistance which medical testimony may provide, is ultimately a legal one, not a medical one.
In these as in other cases, lay testimony on an issue may be more weighty than that of experts. The court may therefore reasonably require testimony by nurses and hospital personnel whose observation of the patient has been more constant, in less guarded circumstances, or simply from another vantage point.[35] Hill apparently has been confined to Chattahoochee 24 hours a day, 365 days a year, for 13 years. More substantial testimony concerning his behavior is available than one psychiatrist's summary observation that, according to "the record" and six months' personal observation, Hill has been on "very, very good behavior" and "has never had any acting-out behavior." The testimony concerning Hill's 1976 condition is disturbingly similar to the equally general, if even more sanguine, description of his condition by another physician in 1971, before Hill was acquitted and committed.[36]
*208 To sum up, if a mental acquitee's entitlement to release is to be determined by a rule of law and according to evidence, there must be evidence. By evidence the court is to be given a rich understanding of the patient's medical history, present condition and behavior; prospective environment at liberty; the available resources for professional and lay observation and control; and the practicality of monitoring the success of a release plan.

C. The court's access to evidence
The foregoing discussion of evidentiary requirements is not offered as an impertinent short-course on trial tactics for public defenders and other acquitees' counsel. It is rather an approximation, in terms of the particular facts of this case, of a standard for necessary evidence in all cases. A substantial failure to meet that standard should result, not in denial of the acquitee's petition and his further indefinite detention, but in further proceedings to lay the missing evidence before the committing judge. Stated in familiar terms, the burden of going forward with the evidence cannot and does not lie wholly on the committed acquitee. It is idle to speak of imposing the burden of proof, in the sense of a duty to produce all the convincing evidence, on one who is segregated from society because of mental illness. It would be more candid and humane to say instead that the state's policy is to continue his commitment until a court is moved to release him by considerations outside the law and the evidence.
The state has a responsibility to continue justified commitments and to terminate those that are not. The release of one in confinement for mental illness, when he is entitled to it under the law and evidence, is not like probation of a convict, granted as a matter of grace; nor like parole, which excuses confinement for the balance of a certain term. Release proceedings are therefore not a matter of adversaries finding, preparing, and presenting "my witness" and "your witness." The state's agencies, especially HRS and its hospital administrators, share with the patient the responsibility to acquire and produce the evidence. The evidence is largely in the state's possession: the treating physicians, the nurses, the orderlies and aides, the medical record-keepers, the release planners, the staffs of community mental health centers  all are public servants whose responsibility in release proceedings is to produce relevant evidence in their possession for consideration by the court.
The court has responsibility and authority to require that the evidence be brought forward, in much the same way the court has power, inherently if not by statute, to order the gathering and production of presentence investigation material in criminal cases. State v. Carter, supra. Measures for identifying and obtaining the necessary evidence will vary with the court, the case, and the availability of substantial assistance by counsel. Needed evidence may be acquired by conventional subpoenas, or by direct orders to the appropriate agencies. Whether affected state agencies are considered parties, witnesses, or court advisors, the result is the same: they are subject to the court's orders reasonably requiring that they gather and produce evidence needed by the court on the issues at hand. See United States v. Ecker, 177 U.S.App.D.C. 31, 46, 543 F.2d 178, 193 (1976):
The ... court, the hospital, the patient, and the government share an obligation to elucidate and explore all the relevant facts.
We do not intend that the committing court shall automatically mobilize a fact-gathering effort and hold a full evidentiary hearing whenever an acquitee files a release petition. A seriously ill and dangerous *209 acquitee, recently committed after an adequate hearing, would not be heard to claim immediately that he recovered on checking into the hospital. We do not underestimate the therapeutic effect of time, isolation, and close treatment. Depending on the evidence and findings at the former committal hearing, or on the prima facie effect of interim written reports that the court may require of the hospital or receive from the acquitee and his counsel, the court in the exercise of sound discretion will schedule full evidentiary hearings for re-examination of the acquitee "at reasonably separated periodic intervals or on the suggestion of the custodial official." In re Connors, 332 So.2d 336, 340 (Fla. 1976). Appellate remedies are available if a hearing is groundlessly denied.
When all affected parties and agencies have responded to the court's needs in an appropriate way, no order granting or denying a release petition should suffer, as this one does, by an absence of evidence. A district court of appeal is not concerned whether the release standard applicable to insanity acquitees is too strict or too lenient; that is the proper concern of the Supreme Court's decisions and rules or the legislature's statutes, or of some convenient marriage of decisions, rules and statutes. Nor are we to be concerned, absent a manifestly erroneous decision, with whether an acquitee is or not likely to injure others if released; that is the very demanding concern of the committing judge, whose breadth of jurisdiction and judgment on such issues cannot be found either in the psychiatric suite or the appellate court. Our proper concern is rather, as stated by Judge Bazelon, to
determine whether there has been a full exploration of all relevant facts, opposing views and possible alternatives, whether the results of the exploration relate rationally to the ultimate decision, and whether constitutional and statutory procedural safeguards have been faithfully observed. Our function is thus not to determine whether the decisions taken by those charged with handling disturbed or disturbing individuals are correct or wise  but whether they are rational in the manner which I have just described. [D. Bazelon, Institutionalization, Deinstitutionalization and the Adversary Process, 75 Col.L.Rev. 897, 910 (1975).]

D. Conditional release
In some cases, of which this may be a model, even a full exploration of all the relevant facts may leave a serious doubt in the mind of the committing judge whether the greater weight of the evidence shows the acquitee is unlikely to injure himself or others  or, by the former standard, that he is no longer manifestly dangerous. When medical benefits from hospitalization have been substantially realized; when the acquitee remains incurably or residually ill; when the acquitee has attained stable remission by care which is also available outside the hospital; and when the doubt concerning his nondangerousness is a product of his past violence and the incalculable risk that he will lose remission while at liberty, the all-or-nothing choice between liberty and absolute confinement is a lottery in which either the acquitee's liberty or the public's safety is often needlessly sacrificed. In those cases the committing judge should consider releasing the acquitee on conditions reasonably calculated to monitor and assure his continued remission, reserving jurisdiction later to order, upon an appropriate hearing, absolute liberty[37] or, again, absolute confinement.
If on remand Judge Willis should find by these standards that conditional release is appropriate for Hill, by way of example, conditions for his release may conceivably be that he remain in his father's household or under his father's direct supervision, that he take the prescribed daily dose of Mellaril in the presence of a designated person, that Hill present himself weekly or at other intervals for psychiatric evaluation at a designated *210 place, that he submit to examination at longer intervals at the Florida State Hospital, and that he and witnesses appear before the court at still longer intervals at hearings for continuing evaluation. The order may contain appropriate directions to state health agencies concerning supervision and reports.
In Powell the committing circuit judge, whose action was challenged by a habeas corpus proceeding before the Supreme Court, had ordered acquitee James Powell recommitted following administrative recommendations for his discharge from Florida State Hospital. Powell had been found not dangerous by the superintendent, but the circuit court found "that the underlying psychosis remains even though the symptoms are in a state of remission," which apparently was dependent on abstinence from narcotics. The circuit court stated:
The recommendations of the hospital and treating physicians are based upon the assumption that this court would have continuing jurisdiction over James Powell after his discharge from hospitalization and consequently could recognize and prevent future narcotic intoxication. This assumption is incorrect. [306 So.2d at 115]
The Supreme Court, sustaining the order for continuing commitment, did not address the circuit court's disavowal of power to order a conditional release hedged with measures to prevent or detect narcotic intoxication.
We find nothing in the rules or decisions of the Supreme Court preventing the conditional release of eligible insanity acquitees and the reservation of continuing jurisdiction, upon a proper showing, to release them absolutely or to recommit them. That power is inherent in the court's continuing jurisdiction over insanity acquitees. State v. Carter, supra; United States v. McNeil, 140 U.S.App.D.C. 228, 434 F.2d 502 (1970); Rawland v. Sheppard, 304 Minn. 496, 232 N.W.2d 8 (1975). That power is also implied in both Rule 3.460, which authorizes the committing court to "give [an insanity acquitee found manifestly dangerous] into the care of his friends, on their giving satisfactory security for the proper care and protection of such person"; and by Rule 3.210(e)(9), which authorizes the committing court to order that an insanity acquitee "receive outpatient treatment at any ... appropriate facility or service on an outpatient basis... ."
As a consequence of the Supreme Court's Powell-Connors reclamation of jurisdiction over insanity acquitees, there is no longer any question of whether the court may address specific orders to agencies of the executive for outpatient treatment and supervision of an acquitee. When the Supreme Court adopted new rules of criminal procedure effective December 31, 1967, pursuant to its Article V power, a committee note to Rule 1.210(a), concerning the commitment and examination of defendants incompetent to be tried, explained the rule's omission of certain provisions in replaced Section 917.01, Florida Statutes (1967), which was otherwise the same. In re Florida Rules of Crim. Proc., 196 So.2d 124, 150 (Fla. 1967):
Committee Note: (a) Same as 917.01 except it was felt that court cannot by rule direct institution officials. Thus words, "* * * he shall report this fact to the court which conducted the hearing. If the officer so reports * * *" and concluding sentence, "[n]o defendant committed by a court to an institution, by reason of the examination referred to in this paragraph, shall be released therefrom, without the consent of the court committing him," should be omitted from the rule but retained by statute.
Despite these reservations, which did not have the Court's approval, 196 So.2d at 124, present Rule 3.210, 343 So.2d at 1260, contains abundant directions to the executive concerning reports and other actions affecting those hospitalized before or after trial for insanity. E.g., rule 3.210(b)(1), (2), (3), (4), (e)(9).
The committing court's inherent power, buttressed by contemporary rules, is sufficient. But even if it were not, the Department of Health and Rehabilitative *211 Services is required by Section 918.017(2), Florida Statutes (1977),[38] to execute court orders for treatment of insanity acquitees:
[T]he court may order that the person receive outpatient treatment at any other appropriate facility or service on an outpatient basis... .
The duty of HRS to respond to orders for "outpatient treatment" cannot sensibly be confined to orders in lieu of initial hospitalization. That duty extends also to conditional release orders; and it is broad enough to include reporting on treatment, including observation.
If no conceivable conditional release plan is practicable or reasonably calculated to achieve its purpose, owing to the acquitee's peculiar disability or other circumstances over which the state has no control, continued confinement may of course be ordered. But if the cause for concern is only that the state cannot or will not provide effective facilities or services which may reasonably be required, that failure cannot be seized on as grounds to deny an eligible acquitee his unconditional release. To hold an insanity acquitee for an indefinite term of preventive detention, on the sole ground that he cannot guarantee his continued remission and the state refuses to provide reasonable measures to monitor and assure it, would render all the law's antecedent acts  his acquittal for insanity, the order of commitment to secure a public necessity, the enforcement of standards for release and for proof, and the hearing on his release petition  a farcical charade.
We need not consider whether conditional release of eligible insanity acquitees is required by the due process clause,[39] because Florida's rules and statutes, indeed its public policy as expressed in the common law, authorize absolute commitment only when it is "necessary" above other reasonably available alternatives. See In re Beverly, 342 So.2d 481, 486 (Fla. 1977) (civil committees):
If there were those capable of surviving safely in freedom either through their own efforts or with the aid of family or friends, hospitalization would not be necessary.

REVERSED, REMANDED.
BOYER, Acting C.J., and MILLS, J., concur.
NOTES
[1] An appellate court will ascertain if it can the unstated findings supporting a trial court's conclusion, and decide the case finally as though the findings were stated. Jacquin-Florida Dist. Co. v. Reynolds, Smith & Hill, etc., 319 So.2d 604 (Fla. 1st DCA 1975). But remand is appropriate where, as here, the trial court has made intermediate findings that are inconsistent with the necessary ultimate finding. Cf. State v. Johnson, 8 Or. App. 263, 266, 493 P.2d 1386, 1388 (1972) ("It is unclear ... whether the court was committing the defendant because he felt she was dangerous to herself or others, or merely because he felt she was in need of prolonged treatment... . For this reason we remand... .")
[2] Rule 3.460, Fla.R.Crim.P.:

When a person tried for an offense shall be acquitted by the jury for the cause of insanity, the jury, in giving their verdict of not guilty, shall state that it was given for such cause. If the discharge or going at large of such insane person shall be considered by the court manifestly dangerous to the peace and safety of the people, the court shall order him to be committed to jail or otherwise to be cared for as an insane person and such person shall be held in custody until released by order of the committing court, or may give him into the care of his friends, on their giving satisfactory security for the proper care and protection of such person; otherwise he shall be discharged.
[3] Section 394.467(1), Florida Statutes (1977):

(1) Criteria.  A person may be involuntarily hospitalized if he is mentally ill and because of his illness is:
(a) Likely to injure himself or others if allowed to remain at liberty, or
(b) In need of care or treatment and lacks sufficient capacity to make a responsible application on his own behalf.
The Baker Act standards were purportedly applicable to insanity acquitees by the implication of Section 394.467(3)(b), Florida Statutes (1973). 1975 legislation made the implication explicit, Section 394.467(5), Florida Statutes (1975). Chapter 77-312, Sections 1 and 2, Laws of Florida, strengthened the legislature's jurisdictional claim.
[4] "In order to conclude that the person is likely to injure himself or others, the judge must conclude that there is such a threat of harm as to comprehend the positive infliction of injury. Ordinarily, this would refer to physical injury, but the judge may very well conclude that the person is likely to inflict emotional injury to another. The statute contemplates the latter as well as the former." In re Beverly, 342 So.2d 481, 487 (Fla. 1977).
[5] Overholser v. Lynch, 109 U.S.App.D.C. 404, 288 F.2d 388 (1961), held that one acquitted of bad check charges because of insanity was properly committed as "dangerous to himself or others" under D.C.Code § 24-301(e) (1973). See also Overholser v. O'Beirne, 112 U.S.App. D.C. 267, 302 F.2d 852, 861 (1962): "[T]o describe the theft of watches and jewelry as `non-dangerous' is to confuse danger with violence... . [T]he release provisions must apply in the same way and with the same force to larceny without violence as to a crime of violence until Congress speaks otherwise."
[6] J. Goldstein and J. Katz, Dangerousness and Mental Illness: Some Observations on the Decision to Release Persons Acquitted by Reason of Insanity, 70 Yale L.J. 225, 235 (1960):

Dangerous behavior might be construed to include: (1) only the crime for which the insanity defense was successfully raised; (2) all crimes; (3) only felonious crimes (as opposed to misdemeanors); (4) only crimes for which a given maximum sentence or more is authorized; (5) only crimes categorized as violent; (6) only crimes categorized as harmful, physical or psychological, reparable or irreparable, to the victim; (7) any conduct, even if not labelled criminal, categorized as violent, harmful, or threatening; (8) any conduct which may provoke violent retaliatory acts; (9) any physical violence towards oneself; (10) any combination of these.
[7] Compare D.C.Code § 21-545 (1973), applicable to civil commitment and release proceedings, which inquires whether "the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty," with D.C.Code § 24-301(e) (1973), applicable to criminal insanity acquitees, which inquires whether the subject will "in the reasonable future be dangerous to himself or others."
[8] See People v. Giles, 557 P.2d 408 (Colo. 1976), applying Colorado's statutory test of whether the acquitee has "no abnormal mental condition which would be likely to cause him to be dangerous either to himself or to others or to the community in the reasonably foreseeable future." Colo. Rev. Stat. § 16-8-120 (1973).
[9] See statutes collected by C. Hamann, The Confinement and Release of Persons Acquitted by Reason of Insanity, 4 Harv.J.Legis. 55, 81, n. 137 (1966). The ALI Model Penal Code § 4.08 likewise conditions release of an insanity acquitee upon the court's satisfaction that the acquitee may be released "without danger to himself or to others." Model Penal Code § 4.08(2) (1962).
[10] 306 So.2d 113 (Fla. 1974).
[11] Chapter 75 305, Laws of Florida. The new statute was designated in the session law, and therefore in the Connors opinion, as § 394.467 (4)(h). 332 So.2d at 339, n. 2. It was renumbered § 394.467(5) in Florida Statutes (1975).
[12] Rule 3.460 was amended in 1974, before Powell was decided, to make explicit that "such person shall be held in custody until released by order of the committing court." In re Rule 3.460, Fla.Rules of Crim.P., 287 So.2d 678 (Fla. 1974).
[13] Chapter 75 305, Section 1, Laws of Florida, added Section 394.467(4)(h)(1), codified as Section 394.467(5)(a), Florida Statutes (1975), providing:

(a) In the case of any patient who has been committed to a mental hospital pursuant to Rule 3.460, Florida Rules of Criminal Procedure, Acquittal for Cause of Insanity, the committing court shall retain jurisdiction in the case.
[14] Section 394.467(5)(b), Florida Statutes (1975):

If ... it is shown that the patient does not continue to meet the criteria for involuntary hospitalization, the hearing examiner shall sign an order allowing the release of the patient, which order shall not be effective until approved by the committing court.
[15] Chapter 77-312, Laws of Florida. Section 10 of the Act provided:

If this act is passed by a two-thirds vote of the membership of each House of the Legislature, Rule 3.210, Florida Rules of Criminal Procedure, as amended, is repealed effective 90 days from the effective date of this act.
The Act was initiated in the House and passed by a vote of 113 yeas and no nays. Fla.H.R. Jour. 195 (1977). The Senate amended the House bill and passed it by a vote of 31 yeas and no nays. Fla.S.Jour. 754 (1977). The House concurred by a vote of 108 yeas and 1 nay. Fla.H.R.Jour. 1083 (1977).
[16] Although the Supreme Court in Boyd did not address other sections of the 1977 Act purportedly affecting insanity acquitees, presumably the Legislature's failure to repeal Rule 3.210 leaves that Rule dominant, by virtue of Powell and Connors, over any inconsistent provision in the 1977 legislation.
[17] Contrast California, where In re Franklin, 7 Cal.3d 126, 101 Cal. Rptr. 553, 562, 496 P.2d 465, 473-74 (1972), held that the accused must prove by a preponderance of evidence that he was incompetent at the time of the offense; consequently regarded a verdict of not guilty by reason of insanity determinative of competency at the time of the act; presumed continued mental disability until the time of verdict; and thereby justified automatic hospital commitment, for a limited period of examination, over due process and equal protection arguments. Without all the links in this chain of reasoning, there may be due process and equal protection objections to denying criminal acquitees the procedural safeguards provided others at the time of commitment. Those objections are obviated by a hearing and an independent determination of the acquitee's mental status and dangerous propensities at the time of commitment. E.g., Fitzsimons v. State, 347 So.2d 1090 (Fla. 2d DCA 1977); People v. Lally, 19 N.Y.2d 27, 277 N.Y.S.2d 654, 224 N.E.2d 87 (1966). We are not concerned here with procedural requirements and substantive standards for initial commitment of acquitees in Florida, nor with potential due process and equal protection objections voiced by acquitees at that time. See State v. Krol, 68 N.J. 236, 344 A.2d 289 (1975).
[18] A District of Columbia verdict was so characterized in United States v. Battle, 166 U.S. App.D.C. 396, 397, 510 F.2d 776, 777 (1975), (emphasis added), although the Court of Appeals elsewhere took pains to say "acquittal by reason of insanity reflects only a reasonable doubt that the defendant was sane at the time of the offense." Bolton v. Harris, 130 U.S.App. D.C. 1, 7, 395 F.2d 642, 648 (1968).
[19] 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966).
[20] 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).
[21] 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).
[22] E.g., Overholser v. Leach, 103 U.S.App.D.C. 289, 257 F.2d 667 (1958); Bolton v. Harris, 130 U.S.App.D.C. 1, 12, 395 F.2d 642, 653 (1968); Dixon v. Jacobs, 138 U.S.App.D.C. 319, 331-33, 427 F.2d 589, 601-03 (1970) (Leventhal, J., concurring); United States v. Ecker, 177 U.S.App. D.C. 31, 46 n. 57, 54, 55-56, 543 F.2d 178, 193 n. 57, 201, 202-03 (1976) (contrasting views of Wilkie, Lumbard and Wright, JJ.). Baxtrom, Jackson, and Humphrey are analyzed in Waite v. Jacobs, 154 U.S.App.D.C. 281, 286-88, 475 F.2d 392, 397-99 (1973) and in United States v. Ecker, 177 U.S.App.D.C. 31, 47-52, 543 F.2d 178, 194-99 (1976).
[23] Section 394.473 provides for such representation of indigents, and there is no reason to suppose that Fla.R.Crim.P. 3.210 was intended to deny that representation to indigent acquitees as a class.
[24] Covington v. Harris, 136 U.S.App.D.C. 35, 45, 419 F.2d 617, 627 (1969). See also Application of Miller, 46 A.D.2d 177, 362 N.Y.S.2d 628, 633 (1974). When the issue is whether an accused is guilty of a particular offense, the law restrains the use of evidence of prior similar offenses tending only to prove propensity, but when as here propensity for violence is the sole issue, the committing judge cannot ignore what we have termed the "simplest of equations": he did it before, he might do it again. Dodson v. State, 334 So.2d 305, 306 (Fla. 1st DCA 1977).
[25] The court's order recites that Dr. Rodriguez testified that "failure to receive such dosages would likely result in a relapse into a psychotic state." For present purposes we may assume that is so, and it may be so, but Dr. Rodriguez did not so testify.
[26] State ex rel. Boyd v. Green, supra, 355 So.2d p. 792.
[27] Neff v. State, 356 So.2d 901, 903 (Fla. 1st DCA 1978).
[28] There is no basis in this record for supposing that Hill is likely to lose remission suddenly and without warning. In reference to Hill's 1965 admission, the staff conference report indicates that Hill's hallucinations antedated his 1964 violence by "at least three or four years."
[29] The likely-to-injure issue framed by paragraph (a) of Section 394.467(1) is inseparable from the paragraph (b) concern with whether the acquitee is "[i]n need of care or treatment and lacks sufficient capacity to make a responsible application on his own behalf," supra n. 3. In Beverly the Supreme Court drew on subsection (b) considerations in determining that one who is "nondangerous," i.e., likely to injure only himself and only by neglect, is committable when "incompetent to determine for himself whether treatment ... would be desirable," but not if treatment decisions can be made effectively by "willing and responsible family members or friends." 342 So.2d at 487. See also O'Connor v. Donaldson, 422 U.S. 563, 574 n. 9, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396, 406 (1975). The paragraph (b) criterion is not an independent ground for commitment, see text at n. 27, but it substantially influences findings under the likely-to-injure standard in paragraph (a).
[30] The failure of health authorities to plan adequately for post-release care, and to exhibit and defend that plan before the court, can be fatal to an otherwise meritorious release petition. In State v. Taylor, 158 Mont. 323, 333-34, 491 P.2d 877, 882-83 (1972), cert. denied, 406 U.S. 978, 92 S.Ct. 2428, 32 L.Ed.2d 677 (1972), the acquitee's remission was dependent on abstention from alcohol. Although a regimen of antabuse (a drug which makes the user ill when he consumes alcohol) may be protective of remission and its enforcement is practicable in some communities, United States v. McNeil, 140 U.S. App.D.C. 228, 230, 434 F.2d 502, 504 (1970), the Montana court stated:

There is no guarantee, nor will the doctors predict, that Taylor will not consume alcohol, if released. Even though the evidence indicates defendant has abstained during his confinement, he has done so within the confines of a controlled environment....
.....
No plan was proposed either by the hospital or defendant for the trial judge's consideration. The record does not show satisfactory evidence... .
[31] The 1971 report stated ambiguously that Hill had then "recovered from his schizophrenic process" but that psychological tests "showed features of schizophrenic process, in remission."
[32] E.g., Jones v. State, 332 So.2d 615 (Fla. 1976); McClain v. State, 327 So.2d 106 (Fla. 1st DCA 1976); Ross v. State, 254 So.2d 40 (Fla. 2d DCA 1971); Blatch v. State, 216 So.2d 261 (Fla. 3d DCA 1968).
[33] Commonwealth ex rel. Finken v. Roop, 234 Pa.Super. 155, 181-82, 339 A.2d 764, 777-78 (1975), quoted approvingly in In re Beverly, 342 So.2d 481, 484-85 (Fla. 1977).
[34] Statistical studies are summarized in D. Diamond, The Psychiatric Prediction of Dangerousness, 123 U.Pa.L.Rev. 439, 444, et seq. (1974):

One can only conclude that psychiatrists who make such judgments tended to over-predict dangerousness greatly, by a factor somewhere between ten and a hundred times the actual incidence of dangerous behavior. It is understandable why this should be so. If the psychiatrist under-predicts danger, and clears a patient who later commits a violent act, he will be subjected to severe criticism. If, on the other hand, he over-predicts danger, he will suffer no consequence from such faulty prediction... . [Id. at 447]
[35] See Application of Miller, 46 A.D.2d 177, 362 N.Y.S.2d 628, 633-34 (1974):

Without disparaging or denigrating the profession of psychiatry, we suggest that the witnesses summoned to the new hearing should include hospital employees such as nurses, orderlies, housekeepers and others who have had daily or frequent contact with petitioner... . It is suggested that a display of ungovernable temper when one has been inconvenienced by a housekeeper having just washed the floor may be more revealing and indicative of future conduct than the impression one gives when he sits across the desk or lies on the couch of a psychiatrist... . [T]he court should reach out for any available evidence which bears on petitioner's conduct while in the Hospital.
[36] The 1971 report sent to Judge Willis by Dr. Hirschberg, superintendent at Chattahoochee, states:

When [Hill] was interviewed ... he conducted himself in a very creditable manner. He answered questions in a direct and logical way, and showed good judgment in his appreciation of how to behave in conformity with the law and rules of ordinary social behavior. From these psychiatric observations, the Staff was able to conclude that he had recovered from his schizophrenic process... . In addition, our psychological test showed features of schizophrenic process, in remission. If he continues to take his Mellaril 50 mg. three times a day, his present state of control of the schizophrenic process will continue and could continue indefinitely.
Because of these findings, we can conclude that he is not dangerous at the present time for living in the community, provided he continues with his medication....
[37] Conditional release cannot be employed to extend indefinitely the court's hold on those entitled to absolute release. In some cases, conditional release is the best means available to secure evidence that the acquitee is eligible for outright release.
[38] Section 918.017(2) was enacted by Chapter 77-312, Section 1, Laws of Florida, as new Section 921.131(2). The quoted provision is entirely independent of the same Section's enactment of new 921.131(1), dealing with bifurcated trials when insanity is a defense. Although the Supreme Court's decision in State ex rel. Boyd v. Green, 355 So.2d 789 (Fla. 1978) seems at first blush to hold the entirety of Chapter 77-312, Section 1, unconstitutional, it in fact was concerned with subsection (1) of new 921.131, quoted in the opinion at n. 1, not with subsection (2). Subsection (2) was not held unconstitutional.
[39] It is held in the District of Columbia Circuit, with respect to both criminal acquitees and civil commitees, that the due process clause requires use of the least restrictive alternative means available for the effective protection of the public. United States v. Ecker, 177 U.S. App.D.C. 31, 543 F.2d 178 (1976); Ashe v. Robinson, 146 U.S.App.D.C. 220, 222, 450 F.2d 681, 683 (1971).