## In the Matter of the Necessity of the Hospitalization of K. M. L.

No. 4708.

Supreme Court of Alaska.

April 17, 1981.

Sue Ellen Tatter, Asst. Public Defender, Brian Shortell, Public Defender, Anchorage, for appellant.

Larri Irene Spengler, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for the State of Alaska.

Jeffrey M. Feldman, Gilmore & Feldman, Anchorage, amicus curiae.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BURKE, Justice.

This appeal challenges the superior court's authority to order the involuntary commitment of a moderately retarded individual.

In 1978, the parents of K.M.L. requested the State of Alaska to initiate commitment proceedings against their eighteen year old son, K.M.L. Their request was prompted, at least in part, by what they viewed as difficult behavior on the part of K.M.L.,[1]

---

1. K.M.L.'s parents identified four separate incidents of troubling aggressive behavior on his part:

First, his mother related an incident in December 1977 (nine months prior to the filing of the petition) in which K.M.L., while riding in a car with his mother, became upset at several individuals who failed to move out of the path of her car in a parking lot. K.M.L.'s mother stated, "well, as I started past them, this one kid—kid, I always—he was a young adult—stepped back toward into [sic] the car like, like he was daring me to hit him or whatever." K.M.L. got out of the car, "call[ed] the guy names" and "put up his fists" in an apparently challenging gesture. The other individual backed off and no further contact resulted.

The second incident occurred some time within the twelve months prior to the filing of the petition and involved K.M.L.'s handling of an unloaded rifle. K.M.L.'s mother returned to the home one day and observed that K.M.L. "had one of the rifles that was in the house and [was] pretending to shoot at the wall or the posters on the wall or whatever but he was

using it like you would a machine gun." No other persons were present and no contact, harm, or violence resulted.

The third incident occurred in April 1978 and involved K.M.L.'s falling on the kitchen floor with his father. Apparently the incident was prompted by his father's complaining that the T.V. was too loud. K.M.L.'s father testified that he had grabbed his son by the neck to turn him around. He then testified K.M.L. "slipped underneath my arm and I fell on the floor. And about that time she [K.M.L.'s mother] came into the business." Regarding the severity of this incident, K.M.L.'s mother testified "they were just altogether laying on the floor. Nobody was punching anyone per se." No injuries or physical harm resulted.

The fourth incident occurred during the summer of 1977 (approximately a year prior to the filing of the petition) and involved K.M.L.'s contact with Anchorage police officers. K.M.L.'s father testified that he observed his son spit at and kick a police officer while being detained on the street.

who is moderately retarded.[2]

The state refused to initiate such proceedings, after concluding that there was no basis upon which K.M.L. could be involuntarily committed.[3] The parents then hired their own attorney and petitioned privately for K.M.L.'s commitment.[4] The petition seeking civil commitment was filed on August 23, 1978.

Probate Master Marjorie D. Bell held a hearing on the parents' petition on September 12, 1978. A psychiatrist who was familiar with K.M.L., Leslie Joel Nyman, M. D.,[5] testified that K.M.L. was "borderline" retarded with an I.Q. of "somewhere around 80, 70."[6] This placed K.M.L. at the highest range of the spectrum of individuals classified as mentally retarded on the basis of I.Q. test scores, and he did not, in Dr. Nyman's own words, suffer from "severe or profound retardation." Stated otherwise, K.M.L. was just barely retarded. Dr. Nyman testified further that K.M.L. suffered from an "aggressive reaction of adolescence,"[7] a behavior problem common to many teenagers. While an aggressive reaction of adolescence is not a psychosis or mental disease, it apparently had resulted, on two occasions, in instances of "scuffling" between K.M.L. and his father and police officers.[8]

K.M.L.'s parents also testified at the hearing before Probate Master Bell. Although they expressed concern about his "lifestyle"[9] and about his having threatened individuals and having "scuffled" with his father and a police officer, no testimony was presented indicating that K.M.L. had ever, on any past occasion, actually physically injured himself or anyone else.

Based on the testimony of Dr Nyman that K.M.L. did *not* suffer from any psychosis or severe mental illness and was *not* severely retarded, the Probate Master granted K.M.L.'s motion to dismiss the petition.

K.M.L.'s parents filed objections to the Master's report and findings. A hearing on the objections was held on October 27, 1978, before the Honorable Victor D. Carlson, Superior Court Judge.[10] Following brief

2. K.M.L. has an I.Q. of approximately 70 to 80. The American Association on Mental Deficiency states that mental retardation "refers to significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior" and appearing in the "developmental period." *Quoted in* Herr, *The New Clients: Legal Services for Mentally Retarded Persons*, 31 Stan.L.Rev. 553, 555 (1979). The World Health Organization formerly classified all individuals with I.Q. scores of 68–85 as "borderline mentally retarded." This category *was later amended to exclude such persons* from the definition of mentally retarded. *Id.* & n.6. Based upon available classifications, it would thus seem that K.M.L. does not suffer severely from mental retardation.

3. K.M.L. has opposed his commitment from the outset. Following the filing of the petition for his involuntary commitment, the Public Defender Agency was appointed to represent his interests.

4. In their petition, K.M.L.'s parents alleged that K.M.L. suffered from "*slight* mental retardation, severe emotional illness, and certain physical problems which lead him to engage in explosive and violent behavior." (Emphasis added.) As noted below, Dr. Nyman confirmed that K.M.L. suffered from "borderline" mental retardation, but contradicted the assertion that he suffered from any mental illness.

5. Dr. Nyman's testimony was the only medical evidence presented by the petitioners in support of the petition for involuntary commitment.

6. See note 2, *supra.*

7. Dr. Nyman described K.M.L.'s condition, testifying:

Well, the primary diagnosis that applies is the unsocialized aggressive reaction of adolescence which is sort of a catchall for behavior problems, people who have problems controling [*sic*] their feelings or their emotions.

8. See note 1, *supra.*

9. The primary focus of the petition for involuntary commitment and Dr. Nyman's testimony concerned K.M.L.'s street contacts and observations of his frequenting the Fourth Avenue area in Anchorage.

10. The objections to the Master's findings did not dispute the conclusions, by the Master, that K.M.L. was not psychotic and was only slightly retarded. The petitioners attempted to draw a distinction between the medical and the statutory or "legal" definition of severe retardation. The petitioners advanced the proposition that the term "severe mental retardation," within

arguments of counsel, now including counsel for the State of Alaska who argued against K.M.L.'s commitment,[11] Judge Carlson reversed the Master's findings holding that the Master had applied "the wrong legal test" to the determination of whether K.M.L. was "severely mentally retarded" and, hence, properly committable.

One month later, in November 1978, the matter again came on for hearing, once more before Judge Carlson. Dr. Nyman testified that Alaska Psychiatric Institute (API), where K.M.L. was being detained, would be an improper place for K.M.L. on a long-term basis. Dr. Nyman stated that the therapy, medication, and care offered by API were more conducive and effective for individuals suffering from mental illnesses, *not* mental retardation. Unlike mental illness, which may be treated and sometimes cured, retardation reflects limitations in intellectual capacity. As such, retardation may be rendered less disabling with training and education, but not with drugs, therapy, or other psychiatric treatment.

Although API constituted an inappropriate placement for K.M.L. on a long-term basis, the court was advised that API was the only licensed facility under the authority of the Commissioner of Health and Social Services and, thus, the only institution to which K.M.L. could have been involuntarily committed.

Following the taking of testimony at the November 1978 hearing, Judge Carlson affirmed his earlier commitment order, implying that profound retardation was not required to support an involuntary commitment. Judge Carlson concluded that under the former version of AS 47.30.340(10) the medical standard for severe retardation was not the same as the "legal standard" for severe retardation. Under Judge Carlson's view, then, K.M.L. was properly committed as suffering from "severe retardation," at

the meaning of the statute, "connotes someone who is functioning well below normal levels."

11. Prior to this hearing before Judge Carlson, the state had not appeared in the proceedings. The only parties previously present were the

least in a legal sense. Following Judge Carlson's order of November 1, 1978, K.M.L. appealed to this court.[12]

Subsequent to the filing of the notice of appeal, K.M.L.'s counsel became aware of a recent change in the definition of a mentally ill person provided in an amendment to AS 47.30.340(10). Prior to July 1, 1978, a person who was "severely mentally retarded" could be involuntarily committed pursuant to AS 47.30.340(10). After that date, however, an amendment to the statute became effective and a "mentally ill individual," capable of being committed involuntarily pursuant to AS 47.30.070(i), was defined as only:

[A]n individual having a psychosis or senile changes which substantially impair his mental health to the degree that he is a danger to himself or others.

Because Dr. Nyman clearly testified that K.M.L. did *not* suffer from either a psychosis or senile changes, K.M.L.'s counsel moved to vacate Judge Carlson's November 1, 1978, commitment order based on a mistake of law, as the parties had been using the wrong (outdated) definition of "mentally ill" in determining whether or not K.M.L. could be involuntarily committed.

A hearing on K.M.L.'s motion to vacate the commitment order was held on April 5, 1979. Although counsel for the state declined to oppose K.M.L.'s motion to vacate, and although counsel for K.M.L.'s parents conceded that the new statute did not expressly authorize K.M.L.'s involuntary commitment, the court nevertheless ordered K.M.L. committed pursuant to the authority contained in another newly amended chapter of the Welfare, Social Services and Institutions Title. Judge Carlson stated:

The order of commitment ... is reaffirmed pursuant to the authority contained in AS 47.80, based upon the fact that my findings support that ...

petitioners (K.M.L.'s parents), represented by their private attorney, and K.M.L., represented by his court-appointed public defender.

12. *In re K. M. L. v. State of Alaska*, Supreme Court File No. 4412.

[K.M.L.] is a person with a handicap and also has a developmental disability, and that it's necessary to provide for him exactly what 47.80 sets forth to do; that it provides for him the opportunity to achieve his highest level of achievement.

K.M.L.'s counsel objected to the entry of the order on the grounds that he had received no notice concerning the possibility of K.M.L.'s commitment under the new chapter, the hearing having been scheduled for the sole purpose of resolving K.M.L.'s motion to vacate the earlier commitment order. The court ruled that the hearing six months earlier, in November 1978, had afforded K.M.L. all of the process which he was due and an amended order of commitment was entered. K.M.L. now appeals the legality of Judge Carlson's second order, involuntarily committing him under the amended statute.

The parties all recognize that AS 47.80.010–.900 does not specifically provide for involuntary commitment.[13] The state and the *amicus curiae* support K.M.L. in his contention that his order of commitment should be reversed. We agree and hold that AS 47.80.010–.900 contains no implicit authority for the involuntary commitment of those handicapped individuals who fall within its scope.

The purpose of AS 47.80 is to provide affirmative services to the handicapped. Mentally retarded individuals have been specifically included within the scope of this chapter. AS 47.80.900(6), (7)(A)(i). The drafters of the act made clear its affirmative nature, stating:

*INTENT.* This Act is intended to assure the provision of quality services to those children and adults who have handicaps by reason of mental or physical disabilities, including persons qualifying for special education services . . . other persons with the same or similar handicaps, and persons handicapped by mental retardation, cerebral palsy, epilepsy, autism or by other developmental disabilities defined in this Act. The primary objective of the Act is to bring together and make optimal use of all available resources—federal, state, local, and private—so that persons with handicaps may be served in the most effective and efficient way. A second goal of the Act is to assure the dignity of persons with handicaps, by reaffirming, and providing for the protection and advocacy of, their rights, which are the same rights as other people of the state of the same age and include the right to live as complete and normal lives as possible and develop their ability and potential to the fullest extent possible. Ch. 165, § 1, SLA 1978.

In certain situations AS 47.80.010 provides for the modification of a handicapped person's civil rights, stating:

Some persons with handicaps may be unable, due to the severity of their handicap, to exercise for themselves all of their rights in a meaningful way; for others modification of some or all of their rights is appropriate. The procedure used for modification of rights shall contain proper legal safeguards against every form of abuse, shall be based on an evaluation of the social capability of the person by qualified experts, and shall be subject to periodic reviews and to the right of appeal to higher authorities.

The statutory scheme requires the Department of Health and Social Services to establish a system to "protect and advocate rights of persons with handicaps." AS 47.80.020. We do not believe that this section should be read so broadly as to create the implied authority to involuntarily commit the handicapped.[14]

---

13. On appeal, petitioners waived their right to respond to appellant's contentions in the case at bar. It is their decision to willingly follow · the decision resulting from the appellant's arguments.

14. AS 47.80.020 was enacted in response to a federal statute providing for joint federal and state protection and advocacy of the rights of developmentally disabled individuals. The statute provides in relevant part:

(a) In order for a State to receive an allotment . . . (1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities, (2) such system must (A) have the authority to

Furthermore, such an interpretation would be inconsistent with the principles of the act. AS 47.80.110 provides:

*Program Principles.* The system of services and facilities required ... shall accord with the principle that treatment, services, and habilitation shall be designed to maximize individual potential, minimize institutionalization, and shall be provided in the least restrictive setting, enabling a person to live as normally as possible within the limitations of the handicap.

Thus, it would seem clear that a fundamental goal of AS 47.80 is to minimize institutionalization in the habilitation of handicapped individuals. "Habilitation" is defined as "education or training for the handicapped to enable them to function better in society." AS 47.80.900(4).

Based upon this reading of AS 47.80 and its available legislative history, we do not believe that this statutory scheme gives the courts authority to involuntarily commit the handicapped.[15]

■ The statutory scheme granting courts the power to involuntarily commit the mentally ill is found in AS 47.30.-010–.340. We agree with Judge Carlson's

conclusion that the legislature, by amending AS 47.30.340(10), effectively withdrew the court's authority to involuntarily commit the mentally retarded. This amendment became effective on July 1, 1978. This was the same date that AS 47.80.010–.900 was implemented establishing new safeguards for the protection of the rights of the handicapped. The fact that the legislature withdrew the mentally retarded from the scope of chapter 30 and included these individuals within the purview of chapter 80 of title 47, clearly indicates the legislature's intent that the mentally retarded be regarded as handicapped individuals, who, through habilitative efforts, can be taught to live complete and normal lives to the fullest extent possible.

In reversing the lower court's commitment order, we are not unmindful of the plight of K.M.L. and his parents. By holding that the courts have no authority to involuntarily commit K.M.L., we in no way suggest that K.M.L. should not avail himself of existing educational programs. We urge the state to fulfill its obligations under AS 47.80.010–.900 to render the necessary assistance to individuals such as K.M.L. We also call to the attention of the parties the protections available under AS 13.26.

---

pursue legal, administrative, and other appropriate remedies to insure the protection of the rights of such persons who are receiving treatment, services, or habilitation within the State, (B) not be administered by the State Planning Council, and (C) be independent of any agency which provides treatment, services, or habilitation to persons with developmental disabilities ....

42 U.S.C. § 6012(a); *see also* 42 U.S.C. § 6010.

While a non-profit corporation has been organized to serve as a vehicle for this joint federal and state support of the protection and advocacy of rights, state and federal regulations more fully delineating the implementation of the acts are still in the process of being promulgated.

15. We believe that a holding to the contrary would suffer from vagueness permitting excessive subjectivity on the part of the courts. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Potential abuse would be great if the courts possessed the authority to place handicapped persons in mental institutions without strictly defined standards. One court could commit a deaf person whom he believed is incapable of caring

for himself. Another may permit deaf individuals to remain at large but believe that limbless veterans are in need of commitment. Furthermore, chapter 80 does not provide adequate procedural safeguards found in chapter 30 of title 47 which specifically provides for the involuntary commitment of the mentally ill.

We also note that the United States Supreme Court has held that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407 (1975). In other words, an individual cannot constitutionally be confined involuntarily simply because he has a handicap and "treatment" may be beneficial.

In addition, the Court has held that, as a constitutional minimum, the criteria justifying an individual's involuntary civil commitment must be proved by "clear and convincing" evidence. *Addington v. Texas*, 441 U.S. 418, 431–33, 99 S.Ct. 1804, 1812–13, 60 L.Ed.2d 323, 334–35 (1979).

The lower court's order of commitment is hereby REVERSED.

COMPTON, J., not participating.