STATE of Utah, Plaintiff and Appellee,

v.

Bernt MURPHY, Defendant
and Appellant.

No. 19824.

Supreme Court of Utah.

June 15, 1988.

Brooke C. Wells, Salt Lake City, for appellant.

David L. Wilkinson, Sandra L. Sjogren, Salt Lake City, for appellee.

STEWART, Justice:

Appellant Bernt Murphy appeals an order of the district court denying his motion for release from the Utah State Hospital and denying his petition for a writ of mandamus to compel the State to provide him with post-release residential and treatment accommodations. We reverse and vacate the trial court's order and remand for further proceedings.

I.

A. *The Facts:*

On September 10, 1957, when Murphy was nineteen years old, he was charged with the rape of a five-year-old girl. Subsequently, he was charged with the homicide of a young woman, but he was never tried on that charge. After a hearing on October 11, 1957, a district court judge held that Murphy was incompetent to stand trial and committed him to the Utah State Hospital until such time as he became competent. The court made no finding as to the nature or type of insanity or mental illness that Murphy suffered from when the alleged crimes were committed.

Murphy's commitment continued at the Utah State Hospital with no further judicial hearings until July, 1972, a period of almost fifteen years. Then a hearing was precipitated by a letter from Dr. Roger S. Kiger, Superintendent of the Utah State Hospital, and Dr. A. John Bennee, a psychiatrist, to the district court stating that Murphy was "no longer psychotic or insane" and was competent to stand trial. He recommended that "appropriate proceedings with respect to due process of the law be instituted." Murphy was arraigned on the rape charge, and on December 6, 1972, after a bench trial, the court found Murphy not guilty by reason of insanity and again committed him to the Utah State Hospital. The court's cryptic findings of fact did not specify the nature of the insanity. No judicial finding has ever been made specifying the nature of Murphy's mental disorder other than mental retardation.

In 1983, Murphy filed a petition with the district court for release from the hospital. After a five-day hearing in January and February, 1984, the trial judge found that Murphy was still mentally ill and ordered his confinement continued. The trial court, in rendering its decision, stated:

The Court has had this matter before it on several occasions, this being the most complete analysis of the program that Mr. Murphy has been subjected to, and also the most complete analysis of the law pertaining to this kind of a question.

Articles ..., cases ..., and testimony of witnesses clearly indicate that Mr. Murphy could not be released to society without some specific guidelines. Mr. Murphy, had he not been mentally ill and had he been like most of the people who have been placed in the Utah State Penetentiary, would [now] be out. And those folks who were represented to be victims ... would not have been denied the opportunity for vengeance.... But because he has a mental illness which, according to the DSM–III and the testimony of the doctors is diagnosed as mild mental retardation, he must be and was placed in a mental institution for confinement. He was subjected to an enormous amount of medication. It appears to this Court that that medication effectively controlled him, if he needed control, and may have caused physical problems with him.... So what we have before the Court now is a 12–year–old man, age is not related to his mental capacity, who is mentally retarded, and his body has grown but his mind hasn't, subjected to being imprisoned in a mental hospital and given an enormous amount of medi-

cation. And the medication has kept him quiet. It's kept him docile. And only recently when the medication was removed, because it was causing physical problems, has he reacted to the tragedy he finds himself in as a 12–year–old with a mental problem. He acts out in an attempt to be released. He appeals to our sympathy. He urges me to form a remedy and to give him an opportunity to enjoy some of the things in life which witnesses called on his behalf enjoy. One of the witnesses functions effectively ... and is a productive human being. The other witness also functions in society though both have some schizophrenia [or retardation] which ... can [be] control[led] by medication.

Mr. Murphy did not get all the ... genes necessary for his mind to grow in his body, and for that reason society feels that he must be controlled.

... *He's not released because he's twelve years old. And he's not released because society has no place to release him to.* For this Court to be in a position to forge a new remedy and forge an alternative, is, as I view 77–14–5, circumscribed by legislative prerogatives ... [The] tragedy of Bernt Murphy would have to stay like it is with no alternatives either because the state of the art of psychiatry and psychology won't forge one or because the legislature won't impose one through the statutes. I hope this doesn't mean we are turning the clock back 300 years to the period when people because of mental illness are incarcerated because society didn't know what to do with them. Maybe that's what the cases are saying to us: [W]e don't understand this. We understand that mental retardation is not curable. You're born with it. If you commit a crime when you have that problem society puts you away, maybe for all of your life, because there is no willing—opportunity or willingness on the part of most people who have the opportunity to do anything about it.

For the reasons just stated ... this Court finds that the mental illness defined as ... mild mental retardation with an adult adjustment disorder seems to be Mr. Murphy's only problem. There's no clear indication that he constitutes a danger to society or to himself. He's reacting now to a desire to be released, for after being held all these years as a person with mental retardation. There's no clear and present danger to society that I see, nor is there any indication that he is not dangerous. That issue is left without clear cut resolution by this Court and the witnesses who testified....

Because of the reasons I've stated ... at this time the Court denies the motion on behalf of Mr. Murphy.

(Emphasis added.)

An appeal was filed from that order to this Court. While that case was in the preliminary stages of the appellate process, the trial court held another hearing in April, 1985. During the 1985 hearing, which is discussed in some detail below, two psychiatrists and one psychologist appeared on behalf of the hospital and unanimously testified that Murphy was not mentally ill and that he suffered only from mild mental retardation.

At the conclusion of the 1985 hearing, the trial court stated, "Now, we learn for the first time that [Murphy's] only real problem is that he's retarded and probably always was...." The trial court's finding was supported by all three mental health experts from the state hospital, each of whom testified that Murphy was not mentally ill.

Just prior to the 1985 hearing, three doctors from the state hospital who had examined Murphy wrote to the trial judge stating: "[Unhealthy behaviors displayed by Murphy] do not approach the threshold necessary to diagnose a mental illness.... *[W]e are prepared to certify to the court that Mr. Murphy does not currently have a mental disease.*" (Emphasis added.) At the hearing, one of the doctors, Dr. Van O. Austin, testified:

[Mental retardation] is the only defect that approaches the threshold of diagnosis, I believe.... I don't see any evidence of organic brain dysfunction. But for the mental retardation, I don't see

any evidence of a mood affect disorder, and I don't see any evidence of a thinking disorder.

Dr. Robert J. Howell, a psychologist who had treated Murphy, also explained his conclusions based on his own independent evaluation of Murphy:

> If you consider mental retardation a mental illness, and it is in the DSM III, he has not recovered from that nor will he ever, in my opinion. But if you do not, as many people do not, then *I would say that whatever mental illness he had, if he ever had one, he has recovered from....* I think there was some kind of sweetheart deal between the County Attorney and the hospital way back when. I've always felt that. I don't think he should have had a defense of insanity to begin with.

(Emphasis added.) The third expert, Dr. C. Jess Groesbeck, who is a psychiatrist and was clinical director of the state hospital, testified simply that Murphy did not have a mental disease.

The letter sent by the hospital to the court, as well as the testimony of the experts, unequivocally supports Murphy's contention that he has recovered from whatever mental illness he may have had. There was no contrary evidence as to Murphy's mental condition at the time of the 1985 hearing.

Although Murphy had been diagnosed in 1984 as having an adult adjustment disorder, all the experts agreed that he suffered from no such difficulty in 1985. Dr. Austin testified, "I think he is well on the [sanity] side of the line [between sanity and insanity] as far as making a diagnosis of adjustment disorder or personality disorder." He further stated, "[a]djustment disorders are transient, situational things that do clear," and "I don't see a basis to make that diagnosis [of adult adjustment disorder] at this time." Dr. Howell affirmed this conclusion, stating, "I don't see him as having an adjustment disorder now." Dr. Groesbeck also affirmed the absence of adult adjustment disorder:

> Q. The adult adjustment disorder that you diagnosed last year, however, you do not find presently to be in operation?
>
> A. No, we don't. I don't.
>
> Q. And you are the clinical director?
>
> A. Yes.
>
> ....
>
> Q. You are prepared, however, at this time to certify to the Court that he doesn't currently have a mental disease?
>
> A. That's correct.
>
> Q. And any such that he may have had in the past he has recovered from at this time?
>
> A. Yes, that would be my opinion.

In sum, the evidence is undisputed that Mr. Murphy has no mental illness and, if he ever had any, he has recovered from it.

The State asserts that Murphy is mentally ill on the ground of a vague suggestion in the evidence that he may be dangerous. Dr. Austin gave the only testimony during the 1985 hearing that suggested that Murphy might be dangerous. Dr. Austin made no suggestion, however, that Murphy might be violent. Essentially, Dr. Austin stated that whatever danger there was came from Murphy's lack of social and occupational skills, sexual maturity, and poor judgment:

> I think that because of his poor judgment, his lack of social skills, his lack of occupational skills, he may be a danger to himself, and because of his sexual maturity, and again poor judgment, he may be a danger to others. However, I don't honestly feel this is due to a mental illness.

In short, the experts agreed with the trial court's finding in 1984 that "this Court finds that the mental illness defined as mild mental retardation with an adult adjustment disorder seems to be Mr. Murphy's only problem." Significantly, the trial court stated, in the context of noting the absence of any clear evidence of danger, that Murphy was "reacting now to a desire to be released, for being held all these years as a person with mental retardation."

Since the trial court did not find that Murphy was dangerous in either 1984 or

1985, and since he has recovered from whatever mental illness he supposedly had, Dr. Austin's assertion in 1985 that he "may be" dangerous is at best problematic, especially in view of the fact that two of the three experts did not even hint that he might be dangerous. More important, the evidence the State presented to the trial court to support the conclusion that Murphy is "dangerous" had virtually no probative value showing dangerousness. Indeed, some of that evidence is appallingly inadequate as evidence of dangerousness. That evidence included the two alleged criminal incidents, which occurred over thirty years ago, and, the following "incidents" which are summarized in defendant's brief:

Appellant was also cited as a potential "risk" based upon hospital records documenting incidents during the years of his institutionalization. The court was informed of the following "incidents": Appellant had once kissed a female patient (T. Vol. II–63); touched a female patient on the thigh (T. Vol. I–63); placed his arm around a female visitor (T. Vol. I–188, Vol. II–118); and engaged in mutual kissing followed by suggestive remarks with a former female patient who had come to visit Appellant (T. Vol. IV–16). The State also produced testimony that Appellant had left the hospital grounds for brief periods on three occasions without permission (T. Vol. II–5, 41) and was once involved in a verbal altercation with a male aide who forcibly took him out of a dining area and placed him in seclusion after an argument with another patient (T. Vol. II–51, 53). Appellant is alleged to have told the aide that "he would kill him" (T. Vol. II–52). All witnesses confirmed that such behavior is common among hospitalized mental patients (T. Vol. III–184) and each incident might well reflect normal behavior outside a hospital setting but is disruptive of the routine of a mental institution (T. Vol. I–62). It is therefore inappropriate to the hospital setting. Other "incidences" brought to the court's attention to illustrate Appellant's "behavior problems" include occasions when Appellant ran bath water without permission (T. Vol. III–22); reported a staff member who made verbal threats against him (T. Vol. III–24); told another patient to "wipe the smirk of his face" (T. Vol. III–27); and took his shoes off without permission during a soccer game (T. Vol. III–27).

The trial judge's 1985 order continuing Murphy's confinement at the hospital was not based on a finding that Murphy is dangerous, but solely upon the lack of adequate community resources to assist him.

B. *Differences Between Mental Retardation and Mental Illness*

The State's contention that Murphy is mentally ill seriously misapprehends the significant difference between mental retardation and mental illness. We recently held that there are significant differences between mental retardation and mental illness and that those differences may not be ignored during involuntary commitment proceedings. In *McClure v. State*, 737 P.2d 1001, 1003–04 (Utah 1987), we stated:

Mental retardation, as defined in Utah Code Ann. § 64–8–13(5) (1986), "means a significant subaverage general intellectual functioning existing concurrently with deficits in intellectual functioning existing concurrently with deficits in adaptive behavior." Mental illness, on the other hand, "means a psychiatric disorder ... which substantially impairs a person's mental, emotional, behavioral or related functioning." Utah Code Ann. § 64–7–28(1) (1986). Importantly, the appropriate institutional responses to mental illness and mental retardation are quite different. The effects of mental retardation may be ameliorated with education and training, whereas mental illness requires psychiatric treatment, counseling, and/or drug therapy. Moreover, Utah has separate institutions designed to deal with persons who are mentally ill and persons who are mentally retarded. *See* Utah Code Ann. §§ 64–7–1 to –56 (1986); §§ 64–8–1 to –27 (1986). Mental illness is intended to be treated at the Utah State Hospital, whereas the limitations resulting from

mental retardation are intended to be minimized through education and training at the Utah State Training School. *See generally Matter of K.M.L.*, 626 P.2d 574, 577 (Alaska 1981).

Virtually all Murphy's manifestations of abnormal behavior result from his mental retardation and thirty-year institutionalization. A person usually adapts to his surroundings to the best of his ability. The environment in a state mental hospital for one who has been involuntarily committed for some thirty years is not especially conducive to a high degree of socialization and refinement of impulses. Nor, in fact, are those qualities characteristic of all people who live successfully on the "outside." Long-term detention in a hospital environment can make for a difficult adjustment to normal life. The problem may be especially difficult for those who are retarded. As one respected treatise has stated:

> Mental retardation is too often perceived as an illness, a problem that the individual has; with appropriate programing and treatment, therefore, the individual can be treated and may be cured. Unfortunately, this view fails to recognize the role of the physical and social environment—*an environment that can exacerbate, or even create, the problems of a person labeled mentally retarded.*

*The Mentally Retarded Citizen and the Law,* xxvi (M. Kindred, J. Cohen, D. Penrod, and T. Shaffer eds. 1976) (emphasis added).

Mental health authorities recognize that mentally retarded persons experience frustrations and emotions similar to those experienced by others. Retarded persons may, however, deal with their frustrations and emotions somewhat differently because their intellectual functioning does not always enable them to cope with, and make reasonable adjustments to, life and to perform tasks to the standards that most do. Nevertheless, the law does not permit retarded persons to be treated as castoffs just because their behavior is not what may be considered "average."

■ Retarded persons have legal rights, including the inalienable liberty not to be unlawfully confined. Neither the State nor the courts may deal with retarded persons as if they are outside legal prohibitions against arbitrary and capricious actions. Nor may the State or the courts ignore, or in any way disregard, their essential humanity. We agree with what one author has stated:

> Each person's capacities must be judged individually before he can be denied rights of citizenship or humanity. This principle should apply to protective services and helping laws as well as to the blatant denials of fundamental rights. There is a fundamental right to be left alone, a right to be allowed to succeed or fail, a right to ignore gratuitous advice, a right not to tell every problem to the social worker, and a right not to answer the door. These components of the right to privacy belong to, and are valued by, all people and must not be taken away from mentally retarded individuals without a particularized showing that they cannot cope by themselves without disastrous consequences. The retarded adult should not be thought of as an eternal child, subject to a lifelong application of *parens patriae.*

P. Wald, *Basic Personal and Civil Rights* in *The Mentally Retarded Citizen and the Law,* 5–6 (M. Kindred, J. Cohen, D. Penrod, and T. Shaffer eds. 1976).

■ The State argues that Bernt Murphy should continue to be confined at the State Hospital, even though the trial court did not find him dangerous to himself or others and despite the overwhelming evidence that he is not mentally ill. To continue his confinement at that institution would be, in effect, to condemn a fifty-year-old man—who is not mentally ill and who has served over twice the maximum prison term usually imposed for the only offense for which he has ever been tried—to close confinement for the rest of his natural life because he is mentally retarded. That the law does not allow. *Cf. Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed. 2d 758 (1962).

## II. RELEASE FROM THE STATE HOSPITAL

The statutory standards that govern release of a person committed to the State Hospital following an acquittal by virtue of a finding of not guilty by reason of insanity are delineated in § 77–14–5, Utah Code Ann. (Supp.1987), which reads in relevant part:

(1) When a jury renders a verdict or a court enters a finding of "not guilty by reason of insanity", the court shall then conduct a hearing within five days to determine if the defendant is presently mentally ill. . . .

(2) After the hearing and upon consideration of the record, if the court finds by clear and convincing evidence that the defendant is still mentally ill and because of that mental illness presents a substantial danger to himself or others, the court shall order him committed to the Utah state hospital. The defendant shall not be released from confinement therein until the court which committed the defendant shall, after hearing, find that the defendant has recovered from his mental illness. . . .

(3) A defendant committed to the Utah state hospital pursuant to subsection (2) may apply, not sooner than six months from the date of the commitment, to the district court of the county from which he was committed, for an order of release on the grounds that he has recovered from his mental illness. At any time that the defendant has recovered from his mental illness, the clinical director of the state hospital shall certify that fact to the court. The court shall conduct a hearing within ten working days of the receipt of the clinical director's report. If the finding is adverse to the defendant, he shall not be permitted another hearing more often than once each year, unless the court otherwise orders. In such hearings, the burden of proof is on the applicant.

■ Pursuant to subparagraph one, an initial commitment hearing must occur after a defendant is found not guilty by reason of insanity. The statute states that the trial court shall order the defendant committed if the court finds clear and convincing evidence of two factors: (1) that the defendant is still mentally ill at the time of the hearing, and (2) that the defendant presents a substantial danger to himself or others because of the mental illness.

After a defendant is committed, he is entitled to be released under paragraph three of § 77–14–5 if he demonstrates that "he has recovered from his mental illness." The State would have this Court impose the additional criterion that the defendant pose no substantial danger to himself or others. The plain language of the statute, however, only requires recovery from the mental illness that precipitated the commitment. If the mental illness disappears, the dangerousness which produced the criminal act, will have also undoubtedly disappeared.

■ Of course, a person may be dangerous to himself or others and be sane. But society does not incarcerate persons solely because they may be dangerous. *See generally Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). It is widely accepted that even though some people in society have propensities to engage in dangerous or harmful acts, they may not ordinarily be incarcerated or involuntarily committed until they take some step in the direction of consummating such an act or unless they are found mentally ill. The acceptance of some risk with respect to the conduct of individuals is an essential characteristic of a free society. *See generally O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). In the absence of a finding of mental illness, a dangerous propensity is not, by itself, sufficient to justify the continuation of an involuntary commitment under this statute.[1] See *Torsney v. Gold,* 47

---

**1.** Compare *Jones v. United States,* 463 U.S. 354, 370, 103 S.Ct. 3043, 3052–53, 77 L.Ed.2d 694 (1983) (upon a verdict of not guilty by reason of insanity, "the Constitution permits the Government, on the basis of the insanity judgment, to confine [the defendant] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society."). *See also Hill v. State,* 358 So.2d 190 (Fla.Dist.Ct.App.1978); *Torsney v. Gold,* 47 N.Y.2d 667, 394

N.Y.2d 667, 394 N.E.2d 262, 420 N.Y.S.2d 192 (1979). As Judge Fahey observed in his concurring opinion in *Ragsdale v. Overholser,* 281 F.2d 943, 950 (D.C.Cir.1960) (Fahey, J., concurring):

> It is by no means clear that society can continue to deprive a person of liberty by attributing to a jury's doubt about his mental condition, which led to his acquittal and mandatory commitment, any and all evil or criminal propensities he may be thought to have, and to keep him in confinement because of them. This would transform the hospital into a penitentiary where one could be held indefinitely for no convicted offense....

Furthermore, a finding of mental illness cannot be inferred solely from a general finding of dangerousness, as the State suggests. Although society clearly has a legitimate interest in protecting its citizens from dangerous individuals, involuntary confinement in a mental institution is justified only if a person exhibits a combination of mental illness and dangerousness to self or others.

An involuntary commitment to a mental institution produces a loss of liberty that is "more than a loss of freedom from confinement." *Vitek v. Jones,* 445 U.S. 480, 492, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980). In balancing the State's interest in protecting the public by confining a possibly dangerous person against that person's right to freedom from physical confinement, *see Youngberg v. Romero,* 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982), the law is clear that dangerousness alone is not sufficient to justify confining a person to a mental institution. In addition, there must be a concomitant finding that the person suffers from a mental illness. *Hill v. State,* 358 So.2d 190, 199 (Fla.Dist.Ct. App.1978); *Torsney,* 47 N.Y.2d at 675, 394 N.E.2d at 266, 420 N.Y.S.2d at 196.

■ The State misconstrues our case law in arguing that dangerousness alone is sufficient for continuing confinement. In both *State v. Jacob,* 669 P.2d 865 (Utah 1983), and *State v. Lindquist,* 674 P.2d 1234 (Utah 1983), the inmates experienced a re

mission of mental illness because of medication. The evidence indicated that if released, the individual inmates would discontinue the medication and mental illness and dangerous tendencies would recur. Thus, the inmates were dangerous because of their mental illnesses. That is not so here. In cases such as *Jacob* and *Lindquist,* where the mental health experts cannot certify that an inmate has recovered from a mental illness, dangerousness is an additional factor to be considered in determining whether continued confinement is necessary. *O'Connor,* 422 U.S. at 575, 95 S.Ct. at 2493; *State ex rel. Leeb v. Wilson,* 27 Ohio App.2d 1, 272 N.E.2d 363 (1971).

In all events, the record in the instant case does not show that the defendant is dangerous. Judge Dee expressly made such a statement at the conclusion of the 1984 hearing and the evidence adduced in 1985 does not contradict that finding.

### III. DISPOSITION

■ Although the experts certified that Murphy is no longer mentally ill, they also expressed a reluctance to release him from the State Hospital because of the effects of his institutionalization for some thirty years. Apparently, the district court would have ordered him transferred to a less restrictive facility to ease his adjustment into society, had there been such a facility available. The lack of adequate facilities constitutes a long-festering problem. In 1965, the Governor's Advisory Committee on Mental Retardation stated:

> 9–23. The present laws are so out-moded and archaic as to be useless in proper handling of this problem and preventing great injustice so far as the retarded are concerned.
>
> ....
>
> Consideration should be given to the establishment of a separate facility to handle retarded delinquents and criminals whose problems and needs require special attention and treatment.

*Mental Retardation, a Comprehensive Plan for Utah,* ¶ 9–23 (1965). To date, no such facility has been established. In 1983,

---

N.E.2d 262, 420 N.Y.S.2d 192 (1979); *State ex rel. Leeb v. Wilson,* 27 Ohio App.2d 1, 272 N.E.2d 363 (1971).

District Judge Cornaby, sitting by designation as a member of this Court in *State v. Jacob*, 669 P.2d 865 at 871, commented in pointed terms in his concurring opinion:

> This Court should not accept the proposition that a patient must be hospitalized for life because state statutes fail to provide for a release conditioned on participation in a mandatory court-ordered out-patient program wherein the patient will receive the required medication and counseling on a regular basis. The problem should be referred by this Court to the Legislature. The Court should review this case after allowing sufficient time for legislative action and implementation, say 1987.

To date, little has been done to remedy this situation. That, however, does not absolve us of the duty of enforcing Bernt Murphy's rights.

In dealing with a dilemma similar to the one that confronts the Court in fashioning a reasonable and lawful remedy, one court has stated:

> But if the cause for concern is only that the state cannot or will not provide effective facilities or services which may be reasonably required, that failure cannot be seized on as grounds to deny an eligible acquittee his unconditional release. To hold an insanity acquittee for an indefinite term of preventive detention, on the sole ground that he cannot guarantee his continued remission and the state refuses to provide reasonable measures to monitor and assume it, would render all the law's antecedent acts—his acquittal for insanity, the order of commitment to secure a public necessity, the enforcement of standards for release and for proof, and the hearing on his release petition—a farcical charade.

*Hill v. State*, 358 So.2d at 211.

There is no legal basis for continuing to confine Murphy to the State Hospital indefinitely. However, simply ordering his immediate, unsupervised release would not serve his best interests. While judicial options in devising a reasonable and lawful

remedy are limited, the district court should, by creative use of various statutory powers and the court's own equitable powers, formulate a program for easing Murphy back into society in a way that will accommodate both the State's and Bernt Murphy's interests. In *State v. Fields*, 77 N.J. 282, 303, 390 A.2d 574, 584 (1978), the Supreme Court of New Jersey addressed the problem of fashioning a remedy for gradually reassimilating a person, such as Murphy, into society:

> It cannot be emphasized too strongly that the relaxation of the restraints on [the petitioner's] liberty must proceed in gradual stages.... [The petitioner] should be afforded the opportunity to demonstrate his ability to cope responsibly with the stresses of normal everyday life with diminishing degrees of supervision. Only after [the petitioner] has progressed to the point where he has proven that he can function in normal society with minimal supervision should consideration be given to unconditional release. This process of gradual deescalation will substantially minimize the risk of erroneous determinations of nondangerousness and will thus protect the State's compelling interest in maintaining the safety and security of its citizens.

The court held that it was the duty of the trial court to mold an appropriate order which provided for less restrictive restraints consonant with the petitioner's condition. The court directed the trial court to take into account the petitioner's experience at the state hospital, his condition at the time, his potential for assimilation into society, the availability of support and help from family and friends, and the well-being of the community.

On remand, the trial court is directed to formulate a plan to provide for a controlled and, if necessary, gradual, transition to a more normal lifestyle pursuant to the legal and equitable powers that the court has under Chapter 3 of Title 62A of the Utah Code [2]. Part three of that chapter allows a

---

2. The slip opinion issued in this case contained references to the previous statute, Utah Code Ann. § 55-19-1 et seq., which was repealed in 1988; references in this opinion are to the new enactment.

district court to order protective services for a disabled adult, including those impaired due to mental illness or deficiency, if the court finds that the individual in question is in need of such services and is unable to consent to the receipt of the services. Utah Code Ann. § 62A–3–305. The provision allows for modification of the court's order as circumstances change. Utah Code Ann. § 62A–3–305(3). Moreover, statute guarantees that when protective services are provided pursuant to a court order, the protected person has "the right to the least possible restriction of his rights, consistent with his welfare and safety." Utah Code Ann. § 62A–3–304(7)(f). In any event, whatever plan is devised, whether under this Act or under the court's general equitable powers, should be tailored to Murphy's specific needs and allow him to be placed in an environment as normal as possible. But that does not mean that he can be cut adrift by the State to fend for himself. The goal will require a thoughtful and dedicated effort on the part of the district court and others who can be counted on to have Murphy's welfare at heart.[3] *See* Annotation, *Release of One Committed to Institution as Consequence of Acquittal of Crime on Ground of Insanity*, 95 A.L.R. 2d 54, at § 21 (1964).

What is emphatically clear is that the present stalemate must be broken so that Murphy can be placed in as normal a lifestyle as possible, without such an abrupt change from his present environment that his safety and well-being are threatened.

Reversed and remanded for proceedings consistent with this opinion.

DURHAM, Justice (concurring):

I join Justice Stewart's opinion; he has articulated a compelling rationale for the result. I write separately, however, because I believe that the "solution" proposed on remand will prove difficult, if not

impossible, to implement, there being few, if any, facilities suitable to meet Mr. Murphy's needs. Justice Howe's concurring opinion details the urgency and complexity of those needs, and I agree with it also. This state has failed dramatically in its moral obligation to provide adequate support systems for adults disabled by mental retardation, as well as by mental illness, who enter the criminal justice system. I wish to underscore the point made by Justice Stewart in referring to the 1965 report of the Governor's Advisory Committee on Mental Retardation. Our laws in this area *are* useless and archaic, and our policies do not prevent injustice. It is to be hoped that the legislature will respond to this need.

ZIMMERMAN, Justice (concurring):

I join in the majority opinion but add a few observations. First, I agree with the majority that Murphy is entitled to release under the relevant statute, section 77–14–5 of the Code. However, there is a more fundamental question. The trial court was unable to find that Murphy presented a danger to himself or others; that ruling is amply supported by the record. In my view, one who has been involuntarily committed because of a mental illness and who is later found no longer to be a danger to him- or herself or to others is constitutionally entitled to freedom. *See Jones v. United States*, 463 U.S. 354, 370, 103 S.Ct. 3043, 3052–53, 77 L.Ed.2d 694 (1983); *Addington v. Texas*, 441 U.S. 418, 426–27, 99 S.Ct. 1804, 1809–10, 60 L.Ed.2d 323 (1979); *Jackson v. Indiana*, 406 U.S. 715, 732–38, 92 S.Ct. 1845, 1855–58, 32 L.Ed.2d 435 (1972). For this reason also, Mr. Murphy must be released.

Second, I share some of the concerns expressed by Justice Howe. There is evidence in the record that suggests that Mr. Murphy may have a difficult time making the transition to a more loosely structured environment and that he may, in fact,

3. During the hearing, the trial court had valuable assistance from the Legal Center for the Handicapped and from Connie Romboy, Director of the Career Guidance Center in Salt Lake City, who extensively tested Murphy and determined that, although Murphy has received

no formal education or training, he is amenable to training for menial positions within the community. It is of some importance that during his testing, Murphy made no inappropriate comments or gestures to any person.

prove ultimately to be a danger to himself or others. However, this cautionary note does not mean that Mr. Murphy is not entitled to release. As Justice Stewart observes, our criminal justice system is not premised on the notion that we can imprison anyone who has a potential for antisocial conduct. In fact, we operate on quite the opposite premise: we routinely release from prison people who we know have a high likelihood of becoming repeat offenders once they have served their sentences and earned the right to a fresh start. They may be dangerous, but they are entitled to be free. The same is true of Mr. Murphy.

Finally, it is unfortunate, as Justice Durham suggests, that the state has largely ignored the problems presented by the fact that a significant number of people entering the criminal justice system suffer from mental illness or retardation. While mandatory incarceration and ever-longer sentences are politically popular, spending money to adequately house those confined, much less treat those suffering from mental problems, is not. Until we as a society face up to the true consequences of the penal policies adopted in our name, the courts will continue to be confronted with agonizingly difficult cases such as this one.

HOWE, Associate Chief Justice (concurring in the result):

I concur in the result. Although both parties to this appeal seem to agree that under the current *Diagnostic and Statistical Manual of Mental Disorders* (DSM–III), published by the American Psychiatric Association, mental retardation is included as a form of mental illness, it does not appear to me that the legislature has adopted that definition. The legislature in Utah Code Ann. § 64–7–28(1) (1986) defines mental illness as

a psychiatric disorder as defined by the current Diagnostic and Statistical Manual of Mental Disorders which substantially impairs a person's mental, emotional, behavioral, or related functioning.

On the other hand, mental retardation is defined in section 64–8–13(5) as

a significant subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period as defined in the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association.

Although both definitions refer to the DSM–III, apparently our legislature intended that "mental illness" not subsume "mental retardation." The majority opinion properly recognizes this difference.

I do not fully subscribe to the majority's assignment of much of Murphy's problems to his thirty-year institutionalization. Concededly, such confinement has taken its toll on him, but his problems are much more deep-seated. I do not agree that the trial court continued Murphy's confinement solely because of inadequate community resources to assist him. Nor do I agree that the doctors who examined Murphy "expressed a reluctance to release him from the state hospital due to the effects of his institutionalization for some thirty years." In February of 1985, the examining doctors sent a letter to Judge Dee which outlined some of Murphy's problems. Excerpts from that letter are as follows:

Dear Judge Dee:

The following is a yearly treatment progress report on Bernt Murphy.

... He continues to display emotional and behavioral lability and impulsivity, unrealistic expectations of his skills and abilities, poor social skills, and inappropriate sexual impulses and controls. . . .

During the past year, the treating staff has given him the opportunity to participate in industrial assignments. His supervisors report that he has been a very good and reliable worker. In addition, since December he has been allowed to go on "home visits" to his aunt's house in West Jordan and has functioned without incident. *However, his participation in the industrial assignment and his last home visit were both curtailed as the result of recent apparently unprovoked violent threats to another patient and staff members.*

If the court continues his present commitment, the treatment staff plans to continue counseling, encourage participation in industrial assignments, structured participation in a sheltered workshop, more frequent home visits, and counseling to ensure that the home visits are both appropriate and productive.

We are not recommending Bernt's release since we feel that releasing him from the State Hospital would be doing a disservice to Bernt and the community. We feel that he lacks the social skills and controls necessary to function anywhere but in a highly structured in-patient setting and lacks the ability to provide for the basic necessities of life or his own welfare. We feel that however well intentioned, his release from the State Hospital would rapidly become a social and individual disaster.

   . . . .

      Sincerely,
      [Doctors' signatures]

(Emphasis added.)

In addition, Dr. Austin testified that he did not "believe that [defendant] can function in society. He barely is able to function within the highly structured programs of the State Hospital." Dr. Austin opined that because of Murphy's poor judgment, his lack of social skills, and his lack of occupational skills, he may be a danger to himself. He also testified that because of Murphy's sexual maturity and poor judgment, he may be a danger to others. Dr. Groesbeck testified that he was likewise concerned that defendant's "ability to handle his impulses, especially of getting angry, [is] still compromised" and thought that "he still lacks social skills in handling himself well." Dr. Austin also testified that Murphy's behavior had recently deteriorated since he had been taken off antipsychotic drugs. Termination of his drug therapy program became necessary when he developed systems of tardive dyskinesia, a condition caused by prolonged use of antipsychotic drugs. Tardive dyskinesia is a degenerative disease that causes damage to the brain and involuntary facial movements.

In view of these assessments of Murphy's condition and his conduct which caused him to be originally committed to the hospital, it is apparent to me that while he can no longer be legally confined in the state hospital, he must continue to live in a highly structured environment with close monitoring lest the disaster occur which the doctors predict.

HALL, Chief Justice (dissenting):

I do not join the Court in ordering the trial court to devise a plan for conditional release of defendant. The Utah State Hospital has already pursued the feasibility of home visits without success due to defendant's propensities for violence. In any event, Utah Code Ann. § 77–14–5 (Supp. 1987) makes no provision for a *conditional* release. One who is criminally committed as being mentally ill remains committed until he has recovered from his mental illness, at which time he is entitled to an *order of release.*[1]

In the instant case, the trial court made no finding that defendant has recovered from his mental illness, and the record supports its determination not to release defendant.

I would affirm the judgment of the trial court.

---

1. *See State v. Jacob,* 669 P.2d 865 (Utah 1983).