IN RE INTEREST OF DAVID WICKWIRE, ALLEGED
TO BE A MENTALLY ILL AND DANGEROUS PERSON.
STATE OF NEBRASKA, APPELLANT, V. DAVID WICKWIRE, APPELLEE.
609 N.W.2d 384

Filed April 21, 2000.    No. S-99-739.

Gary E. Lacey, Lancaster County Attorney, and Barbara J. Armstead for appellant.

Dennis R. Keefe, Lancaster County Public Defender, and Joseph D. Nigro for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

The Lancaster County District Court, sitting as an appellate court pursuant to Neb. Rev. Stat. § 83-1043 (Reissue 1999), affirmed a decision of the Lancaster County Mental Health Board (Board) and dismissed the State's petition seeking to have David Wickwire committed as a mentally ill dangerous person. The State appeals.

## SCOPE OF REVIEW

■ Statutory interpretation presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Raney v. Blecha*, 258 Neb. 731, 605 N.W.2d 449 (2000).

## FACTS

In May 1998, Wickwire was a 20-year-old male living in a Region V group home. Region V is an agency which provides residential services to people with developmental disabilities. Wickwire is mentally retarded, and mental retardation is a developmental disability pursuant to Neb. Rev. Stat. § 83-1205 (Reissue 1999).

On the evening of May 5, 1998, Daniel Jasper, a staff member who supervised Wickwire, reminded Wickwire that if he did not "do anything stupid," he would receive a bicycle that he had been promised for his birthday. Wickwire then went to his room.

At approximately 10:15 p.m., a female employee arrived to work the overnight shift at Wickwire's residence. She was told by Jasper that Wickwire and the other residents of the home were in their rooms, presumably asleep. Around 11 p.m., Wickwire came out of his bedroom wrapped in a blanket and stood in the doorway to the living room. The female employee was lying on the living room couch watching television. In

preparation for bed, she had removed her pants and was wearing only underwear and a T-shirt.

Wickwire began making sexually suggestive comments, and during an apparent debate with himself, he said, " 'I could hurt you and then I won't get my bike this Saturday or I can go back to bed and I'll get my bike this Saturday.' " Wickwire then stated: " 'Well, I guess I'm just going to have to hurt you.' " When Wickwire approached the employee, she ordered him back to bed. Wickwire did not comply.

The employee then stood up and wrapped a blanket around her waist so Wickwire could not see that she was not wearing pants. When she attempted to walk past Wickwire to get to a telephone, he grabbed her, and a struggle ensued. She dropped her blanket and stepped out of her shirt to escape Wickwire's grasp. At some point, she was forced to the floor. During the struggle, Wickwire's blanket fell off and she discovered that he was naked and sexually aroused. She escaped and ran toward the office, with Wickwire following. While she was attempting to unlock the office door, Wickwire was touching her and attempting to remove her underwear. When she succeeded in unlocking the office door, she called the 911 emergency dispatch service; Wickwire then left the office.

On October 30, 1998, Wickwire made unwanted sexual advances against a female employee who is a busdriver for the Lincoln Public Schools Transportation District. The employee had taken a group of special education students to the main office of one of the Lincoln schools. After the other students exited the bus, Wickwire approached the employee, who ordered him to leave. He refused and sat down in the seat behind her. He held down her arms and began caressing her arms and shoulders while blowing in her ear. As the employee reached for her radio, Wickwire said, " 'You don't need to call for help.' " The employee was able to leave the bus without further incident, but she no longer transports Wickwire unless another adult is on the bus.

On November 18, 1998, the State filed a petition with the Board pursuant to the provisions of the Nebraska Mental Health Commitment Act (Commitment Act), Neb. Rev. Stat. § 83-1001 et seq. (Reissue 1999). The State alleged that by reason of behavior occurring in Lancaster County, a deputy Lancaster

County Attorney was of the opinion that Wickwire was a mentally ill dangerous person. The State further alleged that Wickwire had been diagnosed as suffering from mental retardation and was a substantial risk of serious harm to others. The State requested a hearing before the Board to determine whether Wickwire was a mentally ill dangerous person and whether a voluntary hospitalization or other treatment alternative less restrictive was available to prevent the risk of harm described.

At the hearing before the Board, evidence was presented concerning the incidents at the Region V residence and on the bus. Dr. Y. Scott Moore also testified. Moore had evaluated Wickwire and determined that he was mentally retarded with no secondary diagnosis of mental illness. Moore concluded that Wickwire had an IQ in the mid-40's range and that there was no indication or hope that his condition would ever change. Moore opined that Wickwire would not benefit from any sort of inpatient treatment. He stated that Wickwire did not suffer from any mental illness, but that he posed a danger to others.

While Moore acknowledged that the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994), lists mental retardation as a psychiatric diagnosis, he indicated that the appropriate treatment for Wickwire would take place in an institution which specialized in retardation services rather than one that specialized in treating mental illness. He stated: "[P]eople who specialize in a mental illness have nothing to do here." Moore testified that in his general experience, a diagnosis of mental retardation in and of itself does not allow for a civil commitment because mental retardation is not treatable.

The Board dismissed the State's petition, finding that it did not have jurisdiction. In a supplemental order of dismissal, the Board stated that it believed that the evidence was clear and convincing that Wickwire was dangerous to others. The Board concluded however that since Wickwire had been diagnosed with mental retardation only, he was not within the subject matter jurisdiction of the Board. The Board noted that although Moore had alluded to an incompetency finding by a court and a guardianship, there was no evidence in the record before the Board that a district judge had made findings required by law or

that a guardianship existed. Thus, the Board concluded that it did not have jurisdiction of the subject matter and dismissed the petition.

The State appealed to the district court for Lancaster County, and after a de novo review, the district court affirmed the Board's dismissal. The district court found that the Board had properly dismissed the petition at the end of the State's evidence because the evidence showed that although Wickwire was mentally retarded, he was not a mentally ill dangerous person. Since there was no evidence presented showing that Wickwire was mentally ill, the district court concluded that the Board did not have jurisdiction over the subject matter.

The district court noted that the Legislature has provided two separate systems, one for mentally ill dangerous persons and another for mentally retarded persons. Wickwire was already receiving services pursuant to the Developmental Disabilities Services Act (Disability Act), Neb. Rev. Stat. § 83-1201 et seq. (Reissue 1994 & Cum. Supp. 1998), the statutes in effect when the above-described incidents occurred. The court also relied upon Moore's testimony that Wickwire would not benefit from any sort of inpatient treatment in a mental hospital and that nothing other than supervision would help Wickwire control his impulses. The court concluded that there was no program available for Wickwire other than the program of supervision which he was already in. For these reasons, the district court affirmed the Board's dismissal, and the State appeals.

## ASSIGNMENT OF ERROR

The State assigns as error that the Board erred in determining, and the district court erred in upholding, that mental retardation is not a sufficient mental illness to serve as a basis for commitment under the Commitment Act.

## ANALYSIS

The parties agree that the issue presented is whether mental retardation fulfills the "mentally ill" requirement for civil commitment under the Commitment Act. This appears to be a case of first impression in Nebraska. The Commitment Act provides in pertinent part:

It is hereby declared to be the public policy of the State of Nebraska that mentally ill dangerous persons be encouraged to obtain voluntary treatment. If voluntary treatment is not obtained, such persons shall be subject to lengthier and more restrictive involuntary custody and treatment only after mental health board proceedings as provided by the Nebraska Mental Health Commitment Act.

§ 83-1001.

A mentally ill dangerous person is defined as

any mentally ill person, alcoholic person, or drug-abusing person who presents:

(1) A substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm; or

(2) A substantial risk of serious harm to himself or herself . . . .

§ 83-1009. Nowhere within the provisions of the Commitment Act is the term "mentally ill person" defined further.

The State argues that Neb. Rev. Stat. § 29-1823 (Cum. Supp. 1998) makes the Commitment Act applicable to mentally retarded persons and that, therefore, the Board has subject matter jurisdiction over Wickwire. Section 29-1823 provides:

(1) If at any time prior to trial it appears that the accused has become mentally incompetent to stand trial, such disability may be called to the attention of the district court . . . . The judge of the district court . . . shall have the authority to determine whether or not the accused is competent to stand trial. . . . Should the district judge determine after a hearing that the accused is mentally incompetent to stand trial and that there is a substantial probability that the accused will become competent within the foreseeable future, the district judge shall order the accused to be committed to a state hospital for the mentally ill or some other appropriate state-owned or state-operated facility for appropriate treatment until such time as the disability may be removed.

. . . .

(3) If it is determined that there is not a substantial probability that the accused will become competent within the

foreseeable future, then the state shall either (a) commence the applicable civil commitment proceeding that would be required to commit any other person for an indefinite period of time or (b) release the accused.

The State argues that the only vehicle by which it can commit mentally retarded dangerous persons is the Commitment Act because the Disability Act provides assistance to mentally retarded persons, but it does not provide a procedure for committing mentally retarded persons who are dangerous to others. It is the State's position that in circumstances in which a mentally retarded person commits a crime but is found incompetent to stand trial, that person must be committed pursuant to the Commitment Act.

However, the State presented no evidence that Wickwire had been found incompetent to stand trial pursuant to § 29-1823. In his testimony, Moore alluded to a competency hearing, but there was no evidence that a district judge had in fact found Wickwire incompetent to stand trial. Therefore, we do not address whether the Board would have had jurisdiction if Wickwire had been found incompetent to stand trial pursuant to § 29-1823.

We next consider whether the Commitment Act itself provides the Board with jurisdiction over mentally retarded dangerous persons. Statutory interpretation presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *Raney v. Blecha*, 258 Neb. 731, 605 N.W.2d 449 (2000). In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Id.* A statute is open for construction only when the language used requires interpretation or may reasonably be considered ambiguous. *State v. Woods*, 255 Neb. 755, 587 N.W.2d 122 (1998).

Section 83-1009 provides: "Mentally ill dangerous person shall mean any mentally ill person, alcoholic person, or drug-abusing person who presents: (1) A substantial risk of serious harm to another person or persons within the near future . . . ." Section 83-1205 of the Disability Act defines the term "developmental disability" as including "mental retardation." Since

the Legislature has defined the terms "mental illness" and "mental retardation" separately, it is clear that the Legislature did not intend to use the terms "mental illness" and "mental retardation" interchangeably.

Other jurisdictions have treated mental retardation and mental illness separately. In *State v. Murphy*, 760 P.2d 280 (Utah 1988), a 19-year-old was charged with the rape of a young girl. He was found to be incompetent to stand trial and committed to the Utah State Hospital. There was no judicial finding specifying the nature of his mental disorder other than that he suffered from mental retardation. The defendant's petition for release from the mental hospital was denied even though the medical evidence established that the defendant was not mentally ill but suffered only from mild retardation.

The appellate court reversed the trial court's decision and stated:

> The State's contention that [the defendant] is mentally ill seriously misapprehends the significant difference between mental retardation and mental illness. . . .
>
> ". . . Importantly, the appropriate institutional responses to mental illness and mental retardation are quite different. The effects of mental retardation may be ameliorated with education and training, whereas mental illness requires psychiatric treatment, counseling, and/or drug therapy. Moreover, Utah has separate institutions designed to deal with persons who are mentally ill and persons who are mentally retarded."

*Id.* at 284.

In *Com. v. Maggio*, 353 Pa. Super. 157, 509 A.2d 383 (1986), a mentally retarded defendant was committed to a state hospital after he was found incompetent to stand trial. He had been committed pursuant to a statute which allowed civil commitment for those persons who were mentally ill. On appeal, the court concluded that the Mental Health Procedures Act established exclusive comprehensive procedures for commitment and treatment of the mentally ill, while the Mental Health and Mental Retardation Act was to be used to commit the mentally retarded. Although Pennsylvania did not have a facility equipped for treatment of a mentally retarded dangerous person, the court

directed the state to either provide such a facility or pay for treatment in an appropriate facility outside the state.

Here, three conditions must be met in order for the Board to exercise jurisdiction. There must be clear and convincing proof that the person is mentally ill, there must be clear and convincing proof that the person is dangerous, and there must be no alternatives available that are less restrictive than a Board-ordered treatment disposition. The State introduced evidence that Wickwire is mentally retarded, but it has not introduced evidence of a secondary diagnosis of mental illness. Because mental retardation has not been legislatively defined as a mental illness, we cannot say that the State has proved by clear and convincing evidence that Wickwire is mentally ill.

Furthermore, Wickwire would not benefit from inpatient treatment in a mental hospital because his condition is static and not treatable. Moore testified that Board-ordered treatment would serve no purpose and that supervision by a government agency which specializes in mental retardation, such as the type of supervision Wickwire currently receives, is the only means for properly controlling him.

Unless it is determined that Wickwire is also mentally ill, the Board's decision that it lacked jurisdiction over Wickwire is correct. Thus, the district court's judgment which affirmed the Board's dismissal of the action is affirmed.

AFFIRMED.